# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

|  |  |  |
|---|---|---|
| THE STATE OF GEORGIA, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-03621-SCJ |
| | ) | |
| MARK R. MEADOWS, | ) | |
| | ) | |
| *Defendant.* | ) | |

## CORRECTED MEMORANDUM IN SUPPORT OF MOTION TO DISMISS CHARGES AGAINST DEFENDANT MARK R. MEADOWS BASED ON SUPREMACY CLAUSE IMMUNITY

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

LEGAL BACKGROUND .......................................................................5

ARGUMENT .......................................................................................11

    I.     MR. MEADOWS IS IMMUNE FROM THE STATE'S PROSECUTION UNDER THE SUPREMACY CLAUSE. .................................................11

        A.    The Charged Conduct, Carried Out While Mr. Meadows Served As Chief of Staff to the President of the United States, Has A "Nexus with Furthering Federal Policy.".......................................................11

        B.    Mr. Meadows's Conduct "Can Reasonably Be Characterized as Complying with the Full Range of Federal Law.".............................18

    II.    EVEN IF THE COURT WERE TO CONCLUDE THAT MR. MEADOWS IS NOT ENTITLED TO SUPREMACY CLAUSE IMMUNITY, HIS ACTS WOULD BE PROTECTED BY THE FIRST AND FOURTEENTH AMENDMENTS .................................................23

CONCLUSION ....................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Arizona v. United States,*
 567 U.S. 387 (2012) ..................................................................................6

*Barr v. Matteo,*
 360 U.S. 564 (1959) ................................................................................16

*Baucom v. Martin,*
 677 F.2d 1346 (11th Cir. 1982) .................................................... passim

*Buckley v. Valeo,*
 424 U.S. 1 (1976) ....................................................................................24

*Caver v. Cent. Alabama Elec. Coop.,*
 845 F.3d 1135 (11th Cir. 2017) ...............................................................3

*Clifton v. Cox,*
 549 F.2d 722 (9th Cir. 1977) ............................................................ 9, 10

*Comm. on Judiciary, U.S. House of Representatives v. Miers,*
 558 F. Supp. 2d 53 (D.D.C. 2008) ........................................................12

*Democratic Party of Georgia, Inc. v. Crittenden,*
 347 F. Supp. 3d 1324 (N.D. Ga. 2018) ................................................24

*FEC v. Cruz,*
 142 S. Ct. 1638 (2022) ...........................................................................23

*Free v. Bland,*
 369 U.S. 663 (1962) ................................................................................16

*Georgia v. Heinze,*
 637 F. Supp. 3d 1316 (N.D. Ga. 2022) ..................................................3

*Idaho v. Horiuchi,*
 215 F.3d 986 (9th Cir. 2000) ...............................................................2, 9

*In Re Neagle,*
 135 U.S. 1 (1890) ......................................................................... 1, 4, 7, 18

*In re Sealed Case*,
    121 F.3d 729 (D.C. Cir. 1997) ............................................................................17

*Johnson v. Maryland*,
    254 U.S. 51 (1920) ............................................................................................19

*Joyner v. A.C. & R. Insulation Co.*,
    No. CIV. CCB-12-2294, 2013 WL 877125 (D. Md. Mar. 7, 2013) .....................4

*Kentucky v. Long*,
    837 F.2d 727 (6th Cir. 1988) ............................................................ 2, 9, 10, 22

*Kolender v. Lawson*,
    461 U.S. 352 (1983) ..........................................................................................25

*Kordash v. United States*,
    51 F.4th 1289 (11th Cir. 2022) ............................................................... passim

*McCulloch v. Maryland*,
    17 U.S. (4 Wheat.) 316 (1819) ...........................................................................6

*Nadler v. Mann*,
    951 F.2d 301 (11th Cir. 1992) ............................................................................4

*New York v. Tanella*,
    374 F.3d 141 (2d Cir. 2004) .................................................................... passim

*Ohio v. Thomas*,
    173 U.S. 276 (1899) ..................................................................................... 8, 19

*Osborn v. Bank of United States*,
    22 U.S. (9 Wheat.) 738 (1824) .................................................................... 6, 16

*Skilling v. United States*,
    561 U.S. 358 (2010) ..........................................................................................25

*Spencer v. New Orleans Levee Bd.*,
    737 F.2d 435 (5th Cir. 1984) ..............................................................................4

*Tennessee v. Davis*,
    100 U.S. 257 (1879) ..........................................................................................18

*Texas v. Carley*,
  885 F. Supp. 940 (W.D. Tex. 1994) ......................................................2

*Texas v. Kleinert*,
  855 F.3d 305 (5th Cir. 2017) ..................................................... 2, 9, 10

*United States ex rel. Drury v. Lewis*,
  200 U.S. 1 (1906) ....................................................................................8

*United States v. Trump*,
  No. 1:23-cr-00257-TSC (D.D.C.) ................................................... 5, 20

*Virginia v. Amaya*,
  No. 1:21CR91, 2021 WL 4942808 (E.D. Va. Oct. 22, 2021).................9

*Willingham v. Morgan*,
  395 U.S. 402 (1969) ...............................................................................4

*Wyoming v. Livingston*,
  443 F.3d 1211 (10th Cir. 2006)................................................... passim

## Statutes

18 U.S.C. § 1455...................................................................................2, 3

28 U.S.C. § 1442......................................................................................2

O.C.G.A. § 16-14-4(c) ........................................................................ 2, 24

O.C.G.A. §§ 16-10-1................................................................................24

O.C.G.A. §§ 16-4-7..................................................................................24

Reorganization Act of 1939, Pub. L. No. 76-19, 53 Stat. 561................13

## Other Authorities

*Applicability of the Presidential Records Act to the White House Usher's Office*, 31
  Op. O.L.C. 194 (2007).........................................................................17

*Assertion of Executive Privilege With Respect to Clemency Decision*, 23 Op.
  O.L.C. 1 (1999) ...................................................................................12

Elana Kagan, *Presidential Administration*, 114 HARV. L. REV. 2245 (2001) 1, 4, 12

*Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. \*5 (July 15, 2014) ...................................................................................... 12, 18

*Immunity of the Former Counsel to the President From Compelled Congressional Testimony*, 31 Op. O.L.C. 191 (2007) ...................................................................12

Memorandum for John D. Ehrlichman, Assistant to the President for Domestic Affairs, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, Re: *Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff"* (Feb. 5, 1971) ................................................12

Office of Legal Counsel, U.S. Dept. of Justice, *Congressional Oversight of the White House*, slip op. at 9 (Jan. 8, 2021).................................................. 12, 13, 17

Saikrishna B. Prakash, *Fragmented Features of the Constitution's Unitary Executive*, 45 Willamette L. Rev. 701 (2009).........................................................................13

Seth P. Waxman & Trevor W. Morrison, *What Kind of Immunity? Federal Officers, State Criminal Law, and the Supremacy Clause*, 112 YALE L.J. 2195 (2003)....................................................................................................... 1, 15, 19

**Rules**

FED. R. CRIM. P. 12(b)...............................................................................................5

**Constitutional Provisions**

U.S. CONST., art. vi, cl. 2 ....................................................................................1, 6

Defendant Mark R. Meadows moves to dismiss the indictment against him pursuant to Criminal Rule 12(b)(1).[1] As a federal official at the time of the charged conduct, he is immune from state prosecution under the Supremacy Clause of the Federal Constitution. *See* U.S. CONST., art. vi, cl. 2; *In Re Neagle*, 135 U.S. 1, 57 (1890); *Kordash v. United States*, 51 F.4th 1289, 1293 (11th Cir. 2022). The State's prosecution of Mr. Meadows threatens the important federal interest in providing the President of the United States with close, confidential advice and assistance, firmly entrenched in federal law for nearly 100 years, *see* Elena Kagan, *Presidential Administration*, 114 HARV. L. REV. 2245, 2272–81 (2001), and gives rise to precisely the sort of state interference in federal affairs the Supremacy Clause prohibits. Centuries of federal precedent make clear that "states may not impede or interfere with the actions of federal executive officials when they are carrying out federal laws," *Wyoming v. Livingston*, 443 F.3d 1211, 1217 (10th Cir. 2006), and that a federal official carrying out his duties is not "obliged to consider state criminal law at all before acting." Seth P. Waxman & Trevor W. Morrison, *What Kind of Immunity? Federal Officers, State Criminal Law, and the Supremacy Clause*, 112 YALE L.J. 2195, 2233 (2003). Federal courts enforce these fundamental

---

[1] The Federal Rules apply to "all proceedings after removal," except that "state law governs a dismissal by the prosecution." Fed. R. Crim. P. 1(a)(4).

constitutional principles by granting immunity in state prosecutions and dismissing charges under Rule 12(b).[2]

*     *     *

Mr. Meadows removed this proceeding from the Superior Court of Fulton County, Georgia, under the Federal Officer Removal Statute, 28 U.S.C. § 1442, on Tuesday, August 15, 2023, *see* Notice of Removal, Dkt. No. 1, the day after he was indicted on two state-law counts as part of a 19-defendant, 41-count case under the Georgia Racketeer Influenced and Corrupt Organizations Act, O.C.G.A. § 16-14-4(c), *see* Indictment, Dkt. No. 1-1. This Court declined summary remand on Wednesday, August 16, 2023, and set an evidentiary hearing for Monday, August 28, 2023, *see* Order, Dkt. No. 6, after which the Court will "make such disposition of the prosecution as justice shall require." 18 U.S.C. § 1455(b)(5). As set forth in

---

[2] *See Com. of Ky. v. Long*, 837 F.2d 727, 750 (6th Cir. 1988) ("[A] Rule 12(b) motion is a proper vehicle by which to assert the defense of immunity under the Supremacy Clause of the United States Constitution."); *Idaho v. Horiuchi*, 215 F.3d 986, 993 (9th Cir. 2000) ("Supremacy Clause immunity is an issue that should be determined before trial in order to avoid making the federal officer go through an entire state criminal procedure if he is immune."), *vacated as moot*, 266 F.3d 979 (9th Cir. 2001); *see also*, *e.g.*, *Texas v. Kleinert*, 855 F.3d 305, 320 (5th Cir. 2017) (affirming Rule 12(b) dismissal of removed manslaughter charge against local law enforcement official participating in federal joint task force); *New York v. Tanella*, 374 F.3d 141, 146 (2d Cir. 2004) (affirming Rule 12(b) dismissal of removed manslaughter charge against DEA agent); *Texas v. Carley*, 885 F. Supp. 940, 941 (W.D. Tex. 1994) (permitting removal and dismissing charges under Rule 12(b) in state prosecution of U.S. Fish & Wildlife employee for criminal trespass).

the Notice, Mr. Meadows respectfully submits that the most just disposition is for the Court to dismiss the charges against him. *See* Notice of Rem. Dkt. No. 1, at 9.

Mr. Meadows's entitlement to removal and his immunity from prosecution are related but ultimately distinct issues. *See Caver v. Cent. Alabama Elec. Coop.*, 845 F.3d 1135 (11th Cir. 2017) (analyzing removal and immunity separately but concluding that the federal official was entitled to both). The Court certainly can decide to permit removal and notify the state court, which will stop further state-court proceedings, *see* 28 U.S.C. § 1455(b), and then address this motion on a more traditional schedule. Stopping the state criminal proceedings promptly is important. Both the Supremacy Clause and § 1442 protect federal officials from *suit* in state court, not just from liability. *See New York v. Tanella*, 374 F.3d 141, 147 (2d Cir. 2004).[3] But as set forth below, the basis for granting immunity to Mr. Meadows is straightforward under well-settled principles of federal law. The Court would therefore be justified in moving swiftly on both removal and immunity.[4]

---

[3] Moreover, it is clear that the State is seeking to move quickly in the state court such that Mr. Meadows will irreparably lose this constitutional and statutory protection (at least in part) if the Court does not promptly permit removal and notify the state court so as to stop further state criminal proceedings as to him.

[4] The Court would then have discretion in how to proceed. By default, the notice removes to federal court the entire case, not just the charges against Mr. Meadows— whether or not other defendants wish to remove or have a legal basis to do so. *See Georgia v. Heinze*, 637 F. Supp. 3d 1316, 1325 n.8 (N.D. Ga. 2022) ("'It is well settled that if one claim cognizable under Section 1442 is present, the entire action

At least since the Supreme Court's 1890 decision in *Neagle*, the Supremacy Clause has been understood to prohibit States from bringing "suits under state law against federal officials carrying out their executive duties." *Kordash*, 51 F.4th at 1293; *see also Denson v. United States*, 574 F.3d 1318, 1345–46 (11th Cir. 2009). A federal official—including a former official in service at the time of the charged conduct—is immune when the charged conduct has "'some nexus with furthering federal policy and can reasonably be characterized as complying with the full range of federal law.'" *Kordash*, 51 F.4th at 1293 (quoting *Denson*, 574 F.3d at 1348).

As Chief of Staff to the President of the United States and leader of the Executive Office of the President, Mr. Meadows served a critically important advice-and-assist function that has been firmly entrenched in federal law for nearly 100 years. *See* Kagan, *Presidential Administration*, 114 Harv. L. Rev. at 2272–81.

---

is removed, regardless of the relationship between the Section 1442 claim and the non-removable claims.'") (quoting *Nadler v. Mann*, 951 F.2d 301, 306 n.9 (11th Cir. 1992)). Mr. Meadows, of course, had no control over how the case was presented to the grand jury and seeks removal only on his own behalf. A district court may remand proceedings against remaining defendants *after* dismissing charges against federal officials, *see Spencer v. New Orleans Levee Bd.*, 737 F.2d 435, 438 (5th Cir. 1984), and at least one court has severed a case after permitting removal and remanded the non-removable portion, *see Joyner v. A.C. & R. Insulation Co.*, No. CIV. CCB-12-2294, 2013 WL 877125, at *9-10 (D. Md. Mar. 7, 2013). Regardless of how the Court wishes to proceed, Mr. Meadows has an "absolute" right to have the charges against him heard in federal court. *Willingham v. Morgan*, 395 U.S. 402, 406 (1969).

The charged conduct here has far more than "some nexus" to his official duties and the federal policy underlying them. It involves many of the core aspects of the role.

And while his conduct is alleged to have violated *state* law, it "can reasonably be characterized as complying with the full range of *federal* law," *Denson*, 574 F.3d at 1348—which is what matters for Supremacy Clause immunity. Indeed, neither the State of Georgia in its indictment, nor the United States in its recently charged case involving overlapping conduct, *United States v. Trump*, No. 1:23-cr-00257-TSC (D.D.C.) (initiated Aug. 1, 2023), has accused Mr. Meadows of violating federal law. Even if they had, moreover, a federal official does not lose Supremacy Clause immunity based on a violation of federal law where the violation was not clear and willful. *See, e.g.*, *Baucom v. Martin*, 677 F.2d 1346, 1351 (11th Cir. 1982).

Mr. Meadows is thus entitled to have the charges against him dismissed under Criminal Rule 12(b). That Rule allows Mr. Meadows to raise a defense which is capable of determination without the trial, *see* Fed. R. Crim. P. 12(b), and is a well-established vehicle for asserting Supremacy Clause immunity. *See supra* n.2.

## LEGAL BACKGROUND

The Supremacy Clause of the Federal Constitution provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding.

U.S. Const., art. VI, cl. 2. "Although the Supremacy Clause explicitly refers only to the 'Constitution' and 'Laws,' its implication is that states may not impede or interfere with the actions of federal executive officials when they are carrying out federal laws." *Livingston*, 443 F.3d at 1217. Consistent with that understanding, the Supreme Court has long interpreted the Supremacy Clause to provide federal officials "immunity from suit" involving state charges in order to "protect[] federal operations from the chilling effect of state prosecution." *Tanella*, 374 F.3d, 147. "It is not necessary for Congress to provide expressly for such immunity in the statutes under which federal officials act; Supremacy Clause immunity is 'incidental to, and is implied in the several acts by which these [federal] institutions are created, and is secured to the individuals employed in them, by the judicial power alone.'" *Livingston*, 443 F.3d at 1217 (quoting *Osborn v. Bank of United States*, 22 U.S. (9 Wheat.) 738, 865–66 (1824) (Marshall, C.J.)).

Under our Constitution, States can neither enact nor enforce laws that "retard, impede, burden, or in any manner control" federal officers in executing their duties. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819). And what they cannot do expressly—regulate the enforcement of laws "entrusted to the discretion of the Federal Government," *Arizona v. United States*, 567 U.S. 387, 409 (2012)—they cannot do indirectly through ad hoc enforcement of their criminal law.

These principles were well settled when the Supreme Court decided *Neagle* in 1890. There, a Deputy U.S. Marshal, David Neagle, was charged with murder in California for fatally shooting a man while protecting U.S. Supreme Court Justice Stephen J. Field. *See* 135 U.S. 1. After recounting the colorful facts of the case, the Court assessed whether the Constitution and Laws of the United States provided a basis for freeing Deputy Neagle from state custody. *See id*. And the Court concluded that they did. The Court first ascertained that Deputy Neagle was acting under color of federal law in protecting Justice Field, *id.* at 57–58, rejecting California's argument that "there exists no statute authorizing [what Neagle was doing]," *id.* at 58. The Court held that immunity must "extend in a liberal manner . . . to persons imprisoned for the performance of their duty," whether or not federal law authorized the particular task. *Id*. The Court also emphasized that Neagle "did no more than what was necessary and proper for him to do." *Id.* at 75 (emphasis added). As the Eleventh Circuit has since made clear, this analysis turns on whether the federal official's conduct "can reasonably be characterized as complying with the full range of federal law.'" *Denson v. United States*, 574 F.3d 1318, 1348 (11th Cir. 2009).

Since *Neagle*, the Supreme Court has addressed Supremacy Clause immunity only rarely. The two most notable decisions came within 20 years of *Neagle*.

In *Ohio v. Thomas*, 173 U.S. 276 (1899), the Court held that Ohio could not prosecute a federal official for serving margarine in a home for disabled veterans without placing a sign in the window, as required under Ohio law. The Court held that Congress had appropriated money to buy the margarine, and that serving it "was therefore legal, any act of the state to the contrary notwithstanding," under the Supremacy Clause. *Id.* at 283–84.

In *United States ex rel. Drury v. Lewis*, 200 U.S. 1 (1906), the Court affirmed a denial of immunity for soldiers being prosecuted for murder. There was conflicting testimony about whether the fatal shots were fired in hot pursuit of a suspected thief—or instead whether one soldier ordered, and the other soldier carried out, the execution of a civilian who had already surrendered to their pursuit. *See id.* at 3–5. The Court held that pre-trial immunity was unavailable in light of this "conflict of evidence" because it had been "conceded that if [the soldiers had executed the man after he surrendered], it could not reasonably be claimed that the fatal shot was fired in the performance of a duty imposed by the Federal law." *Id.* at 8.

In the modern era, the lower federal courts have applied the doctrine—and done so robustly—in a wide range of cases. As the Eleventh Circuit recently explained, States are broadly prohibited from bringing "suits under state law against federal officials carrying out their executive duties." *Kordash*, 51 F.4th at 1293; *see*

*also Denson*, 574 F.3d at 1345–46 ("[T]he Supremacy Clause . . . serves to prevent state law or state law officials from interfering with or otherwise impeding federal officers as they perform their lawful duties."). Federal-officer immunity has been widely recognized and robustly applied, including in cases from the Second, Fifth, Sixth, Ninth, Tenth, and Eleventh Circuits.[5]

Those cases often involve very serious allegations of misconduct under state law, including murder and manslaughter. *E.g.*, *Texas v. Kleinert*, 855 F.3d 305 (5th Cir. 2017); *Tanella*, 374 F.3d at 141; *Horiuchi*, 215 F.3d at 993, *vacated as moot*, 266 F.3d 979 (9th Cir. 2001); *Virginia v. Amaya*, No. 1:21CR91, 2021 WL 4942808 (E.D. Va. Oct. 22, 2021), *appeal dismissed*, No. 21-4584, 2022 WL 1259877 (4th Cir. Apr. 25, 2022).

Under *Neagle*, a federal official is entitled to immunity if he "'was authorized to do [what he did] by the law of the United States,'" if "'it was his duty to do [it] as [an officer] of the United States,'" and if "'in doing that act he did no more than what was necessary and proper for him to do.'" *Denson*, 574 F.3d at 1347 (quoting *Neagle*, 135 U.S. at 57) (alterations in original). At a general level, the inquiry turns on "whether the officer's acts have some nexus with furthering federal policy and

---

[5] *See Tanella*, 374 F.3d at 144; *Kleinert*, 855 F.3d at 313; *Long*, 837 F.2d at 734; *Clifton v. Cox*, 549 F.2d 722, 728 (9th Cir. 1977); *Livingston*, 443 F.3d at 1217; *Baucom*, 677 F.2d at 1348.

can reasonably be characterized as complying with the full range of federal law." *Id.* at 1348. While the phrase "no more than necessary" might suggest a narrow scope of immunity, that is not how the Courts of Appeals have applied it. They unanimously agree that immunity turns on the official's general role and authority, not specific authorization for the conduct that allegedly constitutes a criminal act.[6]

The Eleventh Circuit has simplified *Neagle*'s somewhat archaic and confusing language: "the inquiry that determines if the Supremacy Clause bars state-law liability is whether a federal official's acts 'have some nexus with furthering federal policy and can reasonably be characterized as complying with the full range of federal law.'" *Kordash*, 51 F.4th at 1293 (quoting *Denson*, 574 F.3d at 1348).

Once a federal officer makes a *prima facie* showing of Supremacy Clause immunity, the burden shifts to the State. "[I]f the state fails to come forward with

---

[6] *See Tanella*, 374 F.3d at 147 ("No one disputes that Tanella was acting in his capacity as a federal DEA Agent when he shot Dewgard."); *Kleinert*, 855 F.3d at 317 ("With probable cause of two federal felonies, Kleinert was authorized to arrest Jackson under 21 U.S.C. § 878."); *Long*, 837 F.2d at 745 ("[E]ven though an agent exceeds his express authority, he does not necessarily act outside of the authority conferred by the laws of the United States."); *Clifton*, 549 F.2d at 728 ("[E]ven though his acts may have exceeded his express authority, this did not necessarily strip petitioner of his lawful power to act under the scope of authority given to him under the laws of the United States."); *Livingston*, 443 F.3d at 1227–28 ("The question is not whether federal law expressly authorizes violation of state law, but whether the federal official's conduct was reasonably necessary for the performance of his duties."); *Baucom*, 677 F.2d at 1350 ("In *Neagle*, it was held that the necessary authority could be derived from the general scope of the officer's duties.").

any evidentiary showing that disputed issues of fact exist to rebut the claim of the federal officer, the district court should sustain the defense of immunity under the Supremacy Clause." *Com. of Ky. v. Long*, 837 F.2d 727, 752 (6th Cir. 1988). "[T]he state cannot overcome that defense merely by way of allegations." *Id.*; *see also Livingston*, 443 F.3d at 1226 ("[O]nce a defendant raises the defense of Supremacy Clause immunity the burden shifts to the state to supply sufficient evidence to raise a 'genuine factual issue' that is supported by more than mere allegations.").

## ARGUMENT

### I.   MR. MEADOWS IS IMMUNE FROM THE STATE'S PROSECUTION UNDER THE SUPREMACY CLAUSE.

Mr. Meadows is immune from prosecution under the Supremacy Clause because his charged conduct has "'some nexus with furthering federal policy and can reasonably be characterized as complying with the full range of federal law.'" *Kordash*, 51 F.4th at 1293 (quoting *Denson*, 574 F.3d at 1348). That is a simple and lenient test, and it is readily met here.

### A. The Charged Conduct, Carried Out While Mr. Meadows Served As Chief of Staff to the President of the United States, Has A "Nexus with Furthering Federal Policy."

The White House Office and the Chief of Staff to the President who leads it "play a unique role in the Executive Branch, providing the President with close and

confidential advice and assistance on a daily basis," and "act as the President's primary information-gathering and policy development-arm." Office of Legal Counsel, U.S. Dept. of Justice, *Congressional Oversight of the White House*, slip op. at 9 (Jan. 8, 2021) (hereinafter *Congressional Oversight*).[7] Congress recognized this important federal interest in authorizing the establishment of the Executive Office of the President (EOP); that legislation responded to the simple conclusion of the Brownlow Committee in 1937: "'The President needs help.'" Elana Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245 (2001) (quoting President's

---

[7] *Available at* https://www.justice.gov/d9/opinions/attachments/2021/01/16/2021-01-08-wh-oversight.pdf. The Executive Branch has maintained for decades—as reflected in opinions from Attorneys General of both parties and attorneys in DOJ's Office of Legal Counsel—that there is a compelling federal interest in protecting the relationship between the President and his most senior aides. *See, e.g.*, *Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. *5 (July 15, 2014); *Immunity of the Former Counsel to the President From Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 192 (2007); *Assertion of Executive Privilege With Respect to Clemency Decision*, 23 Op. O.L.C. 1, 4 (1999); Memorandum for John D. Ehrlichman, Assistant to the President for Domestic Affairs, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, Re: *Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff"* (Feb. 5, 1971). Those opinions have arisen in the context of the Separation of Powers and Congress's authority to compel testimony from senior Presidential aides. But they set forth concerns of outside interference on operation of the White House that apply just as strongly as a matter of Federalism and Supremacy. *See also Comm. on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 99 (D.D.C. 2008) (explaining the persuasive authority of OLC opinions and granting them "as much weight as the force of their reasoning will support").

Comm. on Admin. Mgmt., *Report of the Committee with Studies of Administrative Management in the Federal Government* 5 (1937)). To ensure that the President has the help he needs, "Congress authorized President Roosevelt to establish the EOP under the Reorganization Act of 1939, Pub. L. No. 76-19, 53 Stat. 561; soon thereafter, [President Roosevelt] issued Reorganization Plan No. 1, which became effective in July 1939, 4 Fed. Reg. 2727, 53 Stat. 1423." *Congressional Oversight*, slip op. at 7. In the near century since, the EOP has become "something of a central nervous system of the executive branch." Saikrishna B. Prakash, *Fragmented Features of the Constitution's Unitary Executive*, 45 Willamette L. Rev. 701, 714 (2009). As the President's most senior adviser and leader of the White House Office, the Chief of Staff fulfills a critically important federal function.

The conduct charged here falls squarely within the scope of Mr. Meadows's duties as Chief of Staff and the federal policy underlying that role. He need show only "some nexus," *Kordash*, 51 F.4th at 1293, but here, the connection is much closer than what that broad standard embraces. This Court succinctly summarized the charged conduct involving Mr. Meadows in its order declining summary remand:

- He met (along with President Donald J. Trump) with Michigan officials about election fraud in Michigan. [Doc. No. [1-1]] at 21 (Act 5).

- He messaged the United States Representative from Pennsylvania and then met with Pennsylvania legislators about holding a special session. *Id.* at 21 (Act 6), 22 (Act 9).

- He met with John McEntee [another member of the White House staff] to request a memo about a strategy for "disrupting and delaying the joint session of Congress on January 6, 2021" relating to counting electors' votes. *Id.* at 24 (Act 19).

- He attempted to and was prohibited from physically observing a nonpublic Georgia election audit. *Id.* at 44 (Act 92).

- He arranged a phone call between President Trump and the Georgia Secretary of State's Chief Investigator, Frances Watson, regarding the presidential election results in Georgia. *Id.* (Act 93)

- He messaged Chief Investigator Watson about the potential for a quicker signature verification process of the Fulton County election results if "the [T]rump campaign assist[ed] financially." *Id.* at 45 (Act 96).

- He solicited (along with President Trump) Georgia Secretary of State to violate his oath of office by altering the certified returns for presidential electors. *Id.* at 50 (Act 112).

Order, Dkt. No. 6, at 2.

Taking these allegations as true for purposes of assessing immunity, they have a clear "nexus" or connection with Mr. Meadows's official duties as Chief of Staff. The question is *not* whether Mr. Meadows was specifically authorized or required to do each act, but whether they fall within "the general scope of [his] duties." *Baucom*, 677 F.2d at 1350. They surely do. As noted, those duties included information-gathering and providing close and confidential advice to the President. Moreover, as explained below, the State's characterization of one of these acts as violating state law is wholly irrelevant. *See* Part II.B, *infra*. Stripped of the State's

14

gloss, the underlying facts entail duties with the core functions of a Chief of Staff to the President of the United States: arranging or attending Oval Office meetings, contacting state officials on the President's behalf, visiting a state government building, and setting up a phone call for the President with a state official. Those activities have a plain connection to his official duties and to the federal policy reflected in establishing the White House Office.

The "nexus" is readily apparent. Only by virtue of his Chief of Staff role was Mr. Meadows involved in the conduct charged. Put another way, his federal position was a but-for cause of his alleged involvement. Moreover, if Mr. Meadows had absented himself from Oval Office meetings or refused to arrange meetings or calls between the President and governmental leaders, that would have affected his ability to provide the close and confidential advice that a Chief of Staff is supposed to provide. It is inescapable that the charged conduct arose from his duties and was material to the carrying out of his duties, providing more than merely "some nexus."

The State's prosecution of Mr. Meadows thus threatens the important federal interest in providing the President of the United States with close, confidential advisers and gives rise to precisely the sort of state interference in federal affairs that the Supremacy Clause immunity doctrine is aimed at preventing. *See* Seth P. Waxman & Trevor W. Morrison, *What Kind of Immunity? Federal Officers, State*

*Criminal Law, and the Supremacy Clause*, 112 Yale L.J. at 2231 ("[S]ubjecting federal officers to state criminal sanctions for carrying out their federally appointed duties could make it extremely difficult, if not impossible, for the federal government to function. Even the most dedicated federal servant would be reluctant to do his job conscientiously if he knew it could mean prison time in the state penitentiary."); *see also Denson*, 574 F.3d at 1348 (explaining that Supremacy Clause immunity prevents the States from "frustrat[ing] and imped[ing] the compelling federal interest of allowing federal officers to effectively discharge their duties") (citing *Barr v. Matteo*, 360 U.S. 564, 571 (1959); *Free v. Bland*, 369 U.S. 663, 666 (1962); *Osborn v. Bank of U.S.*, 22 U.S. (9 Wheat.) 738, 865–66 (1824)).

If Georgia could prosecute a Chief of Staff to the President based on a course of conduct that includes, for instance, arranging meetings with legislators from Michigan and Pennsylvania, presumably those States too—and perhaps others— could investigate and potentially prosecute him as well. The implications are staggering, and that prospect would hobble not just the Chief of Staff's ability to carry out the role effectively, but Presidential operations generally. That is contrary to federal law establishing the Executive Office of the President and White House Office to provide the President nimble and effective advice and assistance. The Supremacy Clause does not permit such conflict.

16

Indeed, in other contexts that present similar concerns of chilling the President's staff, "Congress and the federal courts [have] recognized the need to treat the President's inner circle of advisers differently"—namely, to provide more robust protection. *Congressional Oversight*, slip op. at 8. Federal courts, for instance, have recognized the substantial "public interest" in protecting candid communication and advice between a President and his most senior advisors. *In re Sealed Case*, 121 F.3d 729, 751–52 (D.C. Cir. 1997). The law must thus "provide sufficient elbow room for advisers to obtain information from all knowledgeable sources," whether or not they ultimately relay it to the President. *Id.* at 752. Congress has also acknowledged "that the President should have complete discretion in hiring staff with whom he interacts on a continuing basis." *Applicability of the Presidential Records Act to the White House Usher's Office*, 31 Op. O.L.C. 194, 197 (2007).

As the Department of Justice explained in the Obama Administration, "[a]bsent immunity for a President's closest advisers, congressional committees could wield their compulsory power to attempt to supervise the President's actions, or to harass those advisers in an effort to influence their conduct, retaliate for actions the committee disliked, or embarrass and weaken the President for partisan gain." *Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. at *5 (July 15,

2014). The same concern applies *mutatis mutandis* to state prosecution. The Supremacy Clause gives federal officials "immunity from suit" on state charges to "protect[] federal operations from the chilling effect of state prosecution." *Tanella*, 374 F.3d at 147; *see generally In Re Neagle*, 135 U.S. 1 (1890); *Tennessee v. Davis*, 100 U.S. 257 (1879).

This prosecution—insofar as it charges Mr. Meadows with state-law offenses based on his conduct as Chief of Staff to the President of the United States—has the requisite "nexus" to federal policy to give rise to Supremacy Clause immunity.

**B. Mr. Meadows's Conduct "Can Reasonably Be Characterized as Complying with the Full Range of Federal Law."**

Mr. Meadows also satisfies the second prong of the Supremacy Clause immunity analysis because his conduct—even as charged in the Indictment—"'can reasonably be characterized as complying with the full range of federal law.'" *Kordash*, 51 F.4th at 1293 (quoting *Denson*, 574 F.3d at 1348). The key point here is that a federal official is entitled to Supremacy Clause immunity without regard to any provision of state law unless his conduct constituted a clear and objectively unreasonable violation of federal law or the Federal Constitution.

Under *Neagle*, "entitlement to Supremacy Clause immunity is to be ascertained by looking only at federal law"; the whole point is that a federal official carrying out his duties is not "obliged to consider state criminal law at all before

18

acting." Seth P. Waxman & Trevor W. Morrison, 112 Yale L.J. at 2233; *see also Johnson v. Maryland*, 254 U.S. 51, 56–57 (1920) ("[E]ven the most unquestionable and most universally applicable of state laws, such as those concerning murder, will not be allowed to control the conduct of a marshal of the United States acting under and in pursuance of the laws of the United States."); *Thomas*, 173 U.S. at 283 ("[F]ederal officers who are discharging their duties in a state, and who are engaged . . . in superintending the internal government and management of a federal institution, under the lawful direction of its board of managers, and with the approval of congress, are not subject to the jurisdiction of the state in regard to those very matters of administration which are thus approved by federal authority. . . . [Federal] officers, when discharging duties under federal authority pursuant to and by virtue of valid federal laws, are not subject to arrest or other liability under the laws of the state in which their duties are performed.").

Here, the indictment does not allege that Mr. Meadows violated any provision of federal law or of the Federal Constitution. To the contrary, he is charged "with the offense of **SOLICITATION OF VIOLATION OF OATH BY PUBLIC OFFICER, O.C.G.A. §§ 16-4-7 & 16-10-1**," Indictment, Dkt. No. 1-1, at 87 (Count 28), and based on that alleged predicate, "with the offense of **VIOLATION OF THE GEORGIA RICO (RACKETEER INFLUENCED AND CORRUPT**

19

**ORGANIZATIONS) ACT, O.C.G.A. § 16-14-4(c)**," *id.* at 13 (Count 1). Those

purported violations of state law are irrelevant under the second prong; he is not

accused of violating federal law.

And while there has been a recent federal indictment relating to many of the

same issues, *see United States v. Trump*, No. 1:23-cr-00257-TSC (D.D.C.) (initiated

Aug. 1, 2023), Mr. Meadows is neither charged nor identified as a co-conspirator in

that indictment. He is mentioned by title four times, including in connection with the

trip to the Cobb County Civic Center that is cited in the Indictment here:

- "On December 3, Co-Conspirator 1 orchestrated a presentation to a Judiciary Subcommittee of the Georgia State Senate, with the intention of misleading state senators into blocking the ascertainment of legitimate electors. During the presentation . . . [a]n agent of the Defendant and Co-Conspirator 1 falsely claimed that more than 10,000 dead people voted in Georgia. That afternoon, a Senior Advisor to the Defendant told the ***Defendant's Chief of Staff*** through text messages, 'Just an FYI. [A Campaign lawyer] and his team verified that the 10k+ supposed dead people voting in GA is not accurate . . . . It was alleged in [Co-Conspirator 1's] hearing today.' The Senior Advisor clarified that he believed that the actual number was 12." Indictment, *United States v. Trump*, No. 1:23-cr-00257-TSC (D.D.C.), Dkt. No. 1, ¶ 21(a).

- "On December 23, a day after the ***Defendant's Chief of Staff*** personally observed the signature verification process at the Cobb County Civic Center and notified the Defendant that state election officials were 'conducting themselves in an exemplary fashion' and would find fraud if it existed, the Defendant tweeted that the Georgia officials administering the signature verification process were trying to hide evidence of election fraud and were '[t]errible people!'" *Id.* ¶ 28.

- "The plan began in early December, and ultimately, the conspirators and the Defendant's Campaign took the Wisconsin Memo and expanded it to any state that the Defendant claimed was 'contested'— even New Mexico, which the Defendant had lost by more than ten percent of the popular vote. This expansion was forecast by emails the ***Defendant's Chief of Staff*** sent on December 6, forwarding the Wisconsin Memo to Campaign staff and writing, 'We just need to have someone coordinating the electors for states.'" *Id.* ¶ 55.

- "The Defendant repeatedly refused to approve a message directing rioters to leave the Capitol, as urged by his most senior advisors-including the White House Counsel, a Deputy White House Counsel, ***the Chief of Staff***, a Deputy Chief of Staff, and a Senior Advisor. Instead, the Defendant issued two Tweets that did not ask rioters to leave the Capitol but instead falsely suggested that the crowd at the Capitol was being peaceful . . . ." *Id.* ¶ 114.

(Emphasis added.) Nothing suggests Mr. Meadows violated federal law.

The core principle behind the doctrine of Supremacy Clause immunity is that *federal law*, not state law, must govern the conduct of federal officials in carrying out their federal duties. The States may not second-guess or superintend that role. This matter, then, provides a paradigmatic case for applying immunity: the U.S. Department of Justice brought charges related to the aftermath of the 2020 election, including in the State of Georgia, and omitted Mr. Meadows, while the Fulton County District Attorney has charged him with violations of state law arising from his conduct as a federal official in the same matter.

Indeed, even if a federal official *does* exceed his authority under federal law or violates some federal prohibition (or is accused of doing so), that would not be

enough to forfeit his Supremacy Clause immunity. Since the Supreme Court's seminal decision in *Neagle*, federal courts have consistently held that federal agents are immune from state-law prosecution so long as they did not violate federal law maliciously or with criminal intent. *See supra* n.2. For instance, in *Baucom*, the Eleventh Circuit held that it was irrelevant whether an undercover FBI special agent exceeded his authority under federal law by participating in an alleged attempt to bribe a state official; it was enough for the court that he did not act out of "any personal interest, malice, actual criminal intent, or for any other reason than to do his duty as he saw it." 677 F.2d at 1350. Similarly, in *Long*, the Sixth Circuit affirmed dismissal of a burglary charge against an FBI special agent, notwithstanding the agent's violation of FBI regulations, because the district court had found that the agent had "no motive other than to do his job under circumstances as they appeared to him" and "an honest and reasonable belief that what he did was necessary" to the performance of his duties. 837 F.2d. at 744. Thus, even if the State tried to articulate some *post hoc* theory that Mr. Meadows violated federal law, that accusation would not strip him of the immunity to which he is entitled under the Supremacy Clause.[8]

---

[8] The politically-charged nature of the issues involved in this matter further bolster, rather than undermine the basis for protecting federal officials from state law prosecution. *See Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 150 (2007) (explaining that the removal statute's "basic" purpose is to protect the Federal Government from the interference with its "operations" and to protect when

## II.   EVEN IF THE COURT WERE TO CONCLUDE THAT MR. MEADOWS IS NOT ENTITLED TO SUPREMACY CLAUSE IMMUNITY, HIS ACTS WOULD BE PROTECTED BY THE FIRST AND FOURTEENTH AMENDMENTS

If the Court were to conclude that Mr. Meadows is not entitled to Supremacy Clause immunity, that would not mean that the charges against him should proceed to trial. He would still have defenses under the First and Fourteenth Amendments and would seek to raise those before trial.[9]

If the Court were to conclude that the charged conduct did not have any "nexus" to his official duties as Chief of Staff, then it would need to find instead that the First and Fourteenth Amendments protect that activity. All of the alleged conduct as to Mr. Meadows relates to protected political activity that lies in the heartland of First Amendment. The First Amendment "has its fullest and most urgent application precisely to the conduct of campaigns for political office," *FEC v. Cruz*, 142 S. Ct. 1638, 1650 (2022) (citation omitted), and merits "the broadest protection to such

---

State-court proceedings may reflect "local prejudice" against unpopular federal laws or federal officials.); *Jefferson Cnty. v. Acker*, 527 U.S. 423, 447 (1999); *Long*, 837 F.2d at 750 (explaining that the purpose of removal "was to provide a federal forum in any case where a federal official might raise a defense arising from his official duties" and to create "an environment free of local interests or prejudice").

[9] Mr. Meadows did not raise these issues in the Notice of Removal because they are solely contingent defenses, since they presume that he is not immune under the Supremacy Clause. But if necessary, Mr. Meadows would seek the Court's leave to amend the Notice of Removal to assert them and would set them forth in greater detail in a separate motion.

political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people," *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (cleaned up).

For example, whatever one thinks of the merits of the tone and tenor of the discussion with the Georgia Secretary of State, the subject matter was undeniably about public issues of political importance. A candidate for public office does not cease to be a political candidate when the polls close on election day. Rather, the right to "vigorously and tirelessly" advocate for one's own election continues beyond that time. *See Democratic Party of Georgia, Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1347 (N.D. Ga. 2018) (Jones, J.) (enjoining the State of Georgia from certifying election results until certain absentee ballots were counted). Nor is it unlawful to petition for redress pursuant to political or legal process when the results of an election remain undetermined. All the substantive allegations in the Indictment concern unquestionably political activity and thus, if not covered by Supremacy Clause immunity, the charges would be barred by the First Amendment.

Similarly, in that scenario, Mr. Meadows would also have a fair notice defense under the Due Process Clause of the Fourteenth Amendment. If O.C.G.A. § 16-14-4(c) (Georgia RICO), and O.C.G.A. §§ 16-4-7 & 16-10-1 (Solicitation of Violation of Oath by Public Officer), are truly broad enough to criminalize the

conduct of the Chief of Staff as alleged in the Indictment, then those statutes are unconstitutionally vague as applied to the charges against Mr. Meadows. "To satisfy due process, 'a penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Skilling v. United States*, 561 U.S. 358, 402–03 (2010) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). If Georgia law really does apply to Mr. Meadows as alleged in the Indictment, then its enforcement violates his rights under the Due Process Clause of the Fourteenth Amendment.

## CONCLUSION

This Court should dismiss all charges against Mr. Meadows in the Indictment under the Supremacy Clause of the Federal Constitution—or, alternatively, under the First and Fourteenth Amendments.

Dated: August 18, 2023                              Respectfully submitted,

                                                    */s/ George J. Terwilliger III*

Joseph M. Englert                                   George J. Terwilliger, III*
MᴄGᴜɪʀᴇWᴏᴏᴅs LLP                                     John S. Moran*
1230 Peachtree St., N.E., Suite 2100                Michael Francisco*
Atlanta, GA 30309                                   MCGUIREWOODS LLP
(404) 443-5500                                      888 16th Street NW, Suite 500
Jenglert@mcguirewoods.com                           Washington, DC 20006

(202) 857-1700                          * Admitted *Pro Hac Vice*
gterwilliger@mcguirewoods.com
jmoran@mcguirewoods.com              *Counsel to Mark R. Meadows*
mfrancisco@mcguirewoods.com

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies that 14-point Times New Roman font was used for this document and that it has been formatted in compliance with Local Rule 5.1.

August 19, 2023

___/s_____
Michael Francisco
*Attorney for Defendant Mark R. Meadows*

## **CERTIFICATE OF SERVICE**

On August 19, 2023, the foregoing MEMORANDUM IN SUPPORT OF MOTION TO DISMISS CHARGES AGAINST DEFENDANT MARK R. MEADOWS BASED ON SUPREMACY CLAUSE IMMUNITY was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

August 19 2023

___/s_____

Michael Francisco
*Attorney for Defendant Mark R. Meadows*