# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| THE STATE OF GEORGIA, | ) | |
| | ) | CIVIL ACTION NO. |
| | ) | 1:23-cv-03621-SC |
| | ) | |
| v. | ) | |
| | ) | RE: NOTICE OF REMOVAL |
| | ) | OF FULTON COUNTY |
| | ) | SUPERIOR COURT |
| MARK RANDALL MEADOWS | ) | INDICTMENT NO. |
| | ) | 23SC188947 |

## STATE OF GEORGIA'S RESPONSE
## TO DEFENDANT MARK MEADOWS'S NOTICE OF REMOVAL

Defendant Mark Randall Meadows has asked this Court to remove his criminal case from the Superior Court of Fulton County to the Northern District of Georgia. Because the defendant faces charges that do not arise from conduct under the color of his office, and because he can offer no plausible federal defense, the State of Georgia respectfully requests that this Court remand the case to the Superior Court of Fulton County.

The defendant is the former Chief of Staff to the President of the United States, and his lack of care for the lawful scope of his official duties is a matter of record. Federal law prohibits employees of the executive branch from engaging in political activity in the course of their work. The law in question, known as the Hatch

Act, bars a federal employee from "us[ing] his official authority or influence for the purpose of interfering with or affecting the result of an election." 5 U.S.C. § 7323(a)(1). On November 9, 2021, the Office of Special Counsel issued an investigative report finding that prior to Election Day, during Donald J. Trump's campaign for the presidency in 2020, the defendant and at least a dozen other Trump administration officials "did precisely that":

> And while the specific facts of each case are different, they share this fundamental commonality—senior Trump administration officials chose to use their official authority not for the legitimate functions of the government, but to promote the reelection of President Trump in violation of the law.[1]

The report concluded that, "[f]rom OSC's perspective, the administration's attitude toward Hatch Act compliance was succinctly captured by then-Chief of Staff Mark Meadows, who said during an interview that 'nobody outside the Beltway really cares' about Trump administration officials violating the Hatch Act."[2]

It is therefore unsurprising that the defendant now petitions this Court to remove the prosecution of his pending criminal case, in which he stands accused of

---

[1] Exhibit D, Investigation of Political Activities by Senior Trump Administration Officials During the 2020 Presidential Election, 9 November 2021, at 3. The OSC found that Meadows and twelve other Administration officials violated the Hatch Act, a "pattern" that demonstrated "that the Trump administration tacitly or expressly approved of using the power of the executive branch to assist President Trump's reelection." *Id.* at 17.

[2] Exhibit D at 4.

participating in a criminal enterprise that conspired to overturn Georgia's 2020 election in favor of Mr. Trump, invoking his status as a former federal officer. The defendant's indictment in this case results directly from his disregard for the lawful scope of his official duties, a disregard which now forms the basis of his Notice of Removal. Indeed, the defendant has now expressly stated that *all* of his relevant conduct was impermissible political activity. Because the defendant was not acting within the lawful scope of his federal authority during any of the activity described in the indictment, and because he can offer no plausible federal defense for his actions, the State of Georgia respectfully asks that removal not be permitted in this case.

## ARGUMENT

The defendant seeks to remove his pending criminal case under 28 U.S.C. § 1455, on the basis that at the time he engaged in the conduct described in the indictment, he was a "federal officer" under 28 U.S.C. § 1442(a)(1). Federal officer removal is available to any officer, agent, or agency of the United States (1) "for any act under color of such office" so long as they can (2) "raise a colorable defense arising out of its duty to enforce federal law." *Florida v. Cohen*, 887 F.2d 1451, 1454-55 (11th Cir. 1989). The removing party bears the burden of demonstrating that removal is proper, and if the non-removing party "appropriately challenges" the

facts presented in the notice of removal, the removing party "must support [its factual averments] by competent proof." *People v. Trump*, 2023 U.S. Dist. LEXIS 124733, *15 (S.D.N.Y. 19 July 2023) (citations omitted).

The defendant cannot satisfy either element of his burden in this case. Count 1 of the Indictment alleges that the defendant, while associated with a criminal enterprise, unlawfully conspired and endeavored to conduct and participate in the enterprise through a pattern of racketeering activity, both directly and indirectly. That conspiracy contained a common plan and purpose to unlawfully change the outcome of Georgia's presidential election in Mr. Trump's favor. *See* Indictment at 13-14. Count 28 charges the defendant with soliciting Georgia Secretary of State Brad Raffensperger to violate his oath of office by unlawfully "altering, adjusting, or otherwise influencing" the certified returns of the presidential election in Georgia. *Id.* at 87. Neither of these alleged acts fall within the scope of a Chief of Staff's official duties, and the defendant's proffered federal defense of Supremacy Clause immunity cannot apply to them. Put simply, as other courts have previously explained, "the long-recognized purpose of federal-officer removal is the protection of federal *authority*. There is no federal authority to protect here." *State v. Meade*, 2022 U.S. Dist. LEXIS 28535, *18 (S.D. Ohio 17 Feb. 2022) (emphasis original) (citing *Tennessee v. Davis*, 100 U.S. 257, 263 (1880)).

## I.     The defendant was not acting under color of office.

In seeking removal of his case, the defendant must first make a showing that he is a federal officer subjected to criminal prosecution "for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). "The phrase 'relating to' is broad and requires only a 'connection' or 'association' between the act in question and the federal office." *Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1144 (11th Cir. 2017) (internal citations omitted). This is not typically a high bar to clear. However, "[n]ot every act of or on behalf of a federal officer is an act under color of office." *Trump*, 2023 U.S. Dist. LEXIS 124733 at *20. "[T]he person seeking the benefit of [federal officer removal] should be candid, specific and positive in explaining his relation to the transaction growing out of which he has been indicted, and in showing that his relation to it was *confined to his acts as an officer*." *Colorado v. Symes*, 286 U.S. 510, 520 (1932) (emphasis added).

The defendant asserts that "[t]he charged conduct comprises acts taken by Mr. Meadows, whether in an individual or official capacity, under color of his role as Chief of Staff to the President of the United States." Not. at 6.[3] The defendant then

---

[3] It is not clear what the defendant means by "whether in an individual or official capacity"; if the defendant was not acting as a federal officer when he performed the activities giving rise to his indictment, the inquiry ends, and he is not entitled to removal.

characterizes the conduct at issue as "arrang[ing] meetings for the President at the White House and communicat[ing] with state lawmakers and officials"; traveling to Georgia in order to "report back" to then-President Trump about the status of an ongoing post-election audit; and "arrang[ing]" phone calls between Mr. Trump and Georgia officials, including Secretary of State Raffensperger and the Secretary's Chief Investigator, Frances Watson. *Id.* These activities, defendant asserts, "fall squarely within his conduct as chief of staff." *Id.*

In his Notice, the defendant makes no mention of the fact that every single one of the activities giving rise to his indictment constitutes impermissible political activity which a Chief of Staff may not lawfully perform "under color of office." As noted above, federal law forbids any employee of the executive branch from "us[ing] his official authority or influence for the purpose of interfering with or affecting the result of an election." 5 U.S.C. § 7323(a)(1). Federal employees are expressly prohibited from using their official title or position while participating in political activity, which is defined as activity directed toward the success or failure of a political party, partisan political group, or candidate for partisan political office. 5 C.F.R. § 734.101.

This is *precisely* what the defendant is charged with doing, and he does not dispute it. In fact, he has readily admitted it. In his Motion to Dismiss (Document

16-1), filed on August 19, the defendant unreservedly declares that "[a]ll of the alleged conduct as to Mr. Meadows relates to protected political activity that lies in the heartland of First Amendment" and "[a]ll the substantive allegations in the Indictment concern ***unquestionably political activity*** and thus, if not covered by Supremacy Clause immunity, the charges would be barred by the First Amendment." Doc. 16-1 at 23-24. Activities are either political or they are not; the defendant has acknowledged that his activities at issue in this case are "unquestionably political" because they clearly are. However, the defendant does not cite or even acknowledge the Hatch Act, the federal statute that expressly forbids such political activity for executive branch employees acting, or appearing to act, under their official authority. Having admitted that all of his pertinent activity is political, the defendant has acknowledged that all of the activity falls outside the scope of his duties and his "color of office" because he could never, as Chief of Staff, engage in such political activity without violating a federal statute. The defendant fails to satisfy the first requirement for removal because he has stated his actions are, by definition, of a type that can never be taken "under color of office," or even bear a "connection" or "association" to such office. The inquiry can end there.

Even if it does not, however, the defendant is accused of joining a conspiratorial enterprise that sought to overturn an election, as well as soliciting a

Georgia state official to violate his oath of office by somehow altering or affecting the election's returns. It is not clear (and the defendant offers no explanation) how such activity could fall within the color of office of the Chief of Staff. In his Notice, the defendant's cursory examination of the activities directly referenced in the Indictment ignores their plainly political nature, a fact which he went on to clearly admit in his Motion to Dismiss:

- Count 1, Act 5 concerns a November 20, 2023 meeting between the defendant, Mr. Trump, and a collection of Michigan legislators in the Oval Office. Mr. Trump used the meeting to make a series of baseless and false claims about fraud in Michigan's presidential election, saying it had cost him the election. The legislators contradicted Mr. Trump, who then allowed Rudy Giuliani, serving as an attorney for the Trump Campaign and as a personal attorney to Mr. Trump, to join by phone in order to continue to assert false claims of fraud. The defendant was present for the entire meeting. *See* Exhibit A. The defendant's participation in this meeting was clearly political activity prohibited by the Hatch Act.

- As noted in Count 1, Act 6, the very next day after the meeting described in Act 5, the defendant asked a congressman to connect him

to two Pennsylvania legislators because Mr. Trump wanted to "chat" with them. This was clearly political activity prohibited by the Hatch Act.

- Count 1, Act 9 concerns the defendant's participation in a separate meeting with another group of Pennsylvania legislators on November 25, 2020. In this meeting, Mr. Trump personally thanked these legislators for supporting claims about supposed election fraud in Pennsylvania earlier that day, and he discussed with them the possibility of holding a special legislative session for the express purpose of unlawfully appointing presidential electors loyal to Mr. Trump. *See* Exhibit B. The defendant's participation in this meeting was clearly political activity prohibited by the Hatch Act.

- Count 1, Act 19 concerns a meeting between the defendant, Mr. Trump, and John McEntee, the Director of the White House Presidential Personnel Office. The defendant and Mr. Trump asked Mr. McEntee to prepare legal arguments and strategy designed to allow Vice President Mike Pence to disrupt or delay the counting of electoral votes on January 6, 2021, in violation of the requirements of the Electoral Count Act. McEntee did so at the behest of the defendant and Mr. Trump. *See*

Exhibit C. This was clearly political activity prohibited by the Hatch Act.

- Count 1, Act 92 describes the defendant's December 22, 2020 unscheduled arrival at the location of an ongoing signature match audit being conducted by Georgia's Secretary of State. Georgia officials, including the Secretary of State's Chief Investigator, prevented the defendant from entering the area where the audit was being conducted. The audit concerned evaluation of absentee ballot signatures under applicable Georgia law and had no connection to any federal executive branch authority, duty, or power.

- As described in Count 1, Act 93, the defendant arranged a phone call the next day between the Chief Investigator and Mr. Trump during which Mr. Trump again repeated false claims of victory in Georgia's election and said that if the "right answer" were to come out, the Investigator would be "praised." The defendant's participation in this Act was clearly political activity prohibited by the Hatch Act.

- Count 1, Act 96 describes how, four days later, the defendant personally texted the Chief Investigator asking whether the Secretary of State's signature audit would "speed up" and be complete by January 6 "if the

trump campaign assist financially." The defendant thus explicitly contacted a Georgia official on behalf of the Trump campaign, which is political activity prohibited by the Hatch Act.

- Both Count 1, Act 112 and Count 28 concern the defendant's participation in the January 2, 2021 phone call between Mr. Trump and Secretary of State Raffensperger. During the call, the defendant identified himself as the Chief of Staff. The only other speakers on the call were Mr. Trump, attorneys working on behalf of the Trump campaign, and officials from the Georgia Secretary of State's Office. The defendant contradicted the Secretary of State's own conclusions about the number of "dead voters" in the presidential election and suggested that the Secretary's General Counsel make plans to meet with the Trump campaign's attorneys in order to see "what we've got" in additional meetings. Mr. Trump made numerous false statements and asked the Secretary to "find 11,780 votes," exactly the quantity of votes needed to reverse his electoral loss in Georgia, saying "All I want to do is this."[4] At the time, Georgia's electoral results had already been

---

[4] "Here's the full transcript and audio of the call between Trump and Raffensperger," Amy Gardner and Paulina Firozi, *Washington Post*, 5 January

certified twice after a hand recount, and the Trump campaign was actively suing the Secretary of State. At no point during the call did either Mr. Trump or the defendant cite or acknowledge any federal authority concerning the topics discussed. The defendant's participation in this phone call was clearly political activity prohibited by the Hatch Act.

Since the defendant was forbidden by law to use his authority or influence to interfere with or affect the result of an election or otherwise participate in activity directed toward the success of Mr. Trump as a candidate for the presidency, every single one of these activities fell outside the scope of his duties, both as a matter of fact and as a matter of law. However, without even considering the legal requirements of the Hatch Act, it is still clear that these activities were not taken "under color of office." Employing an analysis that considered "the relationship of the challenged conduct to the claimed corresponding function of the President," another federal court has already found that Mr. Trump's "direct outreach to state election officials" were "not official acts." *Thompson v. Trump*, 590 F. Supp. 3d 46,

---

2021, found at https://www.washingtonpost.com/politics/trump-raffensperger-call-transcript-georgia-vote/2021/01/03/2768e0cc-4ddd-11eb-83e3-322644d82356_story.html.

82-83 (D.D.C. 2022). All of the defendant's actions here, like the actions of Mr. Trump discussed in *Thompson*, "do not relate to [the President's] duties of faithfully executing the laws, conducting foreign affairs, commanding the armed forces, or managing the Executive Branch. They entirely concern his efforts to remain in office for a second term." *Id.* at 84. Finally, while the defendant is expected to make a "candid, specific and positive" showing "explaining his relation to the transaction growing out of which he has been indicted, and in showing that his relation to it was confined to his acts as an officer," the defendant has not made any such showing. And he cannot, because "[a] sitting President is prescribed no role" in the election of a president.[5] *Id.* at 77. While the Constitution and the Electoral Count Act specify the duties of various officials in Congress and at the state level, there is no role whatsoever for the president to play and thus no authority the defendant can cite to claim his activities were taken "under color of office." *See id.* at 77-78.

The defendant has admitted that all of his relevant actions relating to the indictment were "political activity," which is precisely the sort of activity federal

_____

[5] This is very intentional, as a sitting president running for reelection should not have any role in determining whether he has won or lost his own race. A House of Representatives committee proposing reforms to the Hatch Act in 1975 wrote that, "it is imperative that [partisan political activities] be kept as far removed from the official duties of the President and the Vice President as the public interest will permit." H.R. Rep. No. 94-444, at 5 (1975).

law forbade him from taking under the color of his office. An evaluation of the actions named in the indictment makes clear that all of them were intended to "interfere with or affect" the presidential election in Georgia and elsewhere in order to somehow transform Mr. Trump from an unsuccessful candidate into a successful one. The activities are precisely the type which other courts have already determined to be "unofficial" and therefore beyond the color of the defendant's office, and he can point to no presidential authority that would bring the activities within the scope of his official duties. For all of these reasons, the defendant fails to make a "more detailed showing" that he was acting under color of office for all of the activity named in the indictment. His Notice of Removal must fail.

## II.     The defendant cannot assert a colorable federal defense.

To remove a case under § 1442, the defendant also must raise a "colorable federal defense." *Mesa v. California*, 489 U.S. 121, 136 (1989). In the context of removal, "colorable" means "plausible." *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996). In his Notice, the defendant raises the defense of Supremacy Clause immunity. Supremacy Clause immunity requires the defendant to show both that he was performing "an act which he was authorized to do by the law of the United States" and that, in performing that authorized act, "he did no more than what was necessary and proper for him to do." *In re Neagle*, 135 U.S. 1, 75

(1890). In the Eleventh Circuit, a defendant's claim of Supremacy Clause immunity is negated by evidence that they acted out of "personal interest, malice, actual criminal intent, or for any other reason than to do [their] duty as [they] saw it." *Baucom v. Martin*, 677 F.2d 1346, 1350 (11th Cir. 1982).

The defendant cannot demonstrate that he has a plausible defense of Supremacy Clause immunity for several reasons. First, as detailed above, he has admitted that his pertinent activities were all "unquestionably political" in nature and therefore, by definition, outside the lawful scope of his authority as Chief of Staff. Additionally, the activities in which he assisted Mr. Trump were all "unofficial" activities concerning his efforts to remain in office for a second term, and there is no authority for a president or his chief of staff to take any actions concerning the administration of a presidential election under either the Constitution or federal law.

Under the Constitution, it is the States that are empowered to select Electors who will cast votes for President and Vice President, and the Electors transmit a tally of those votes to the President of the Senate. U.S. Const. art. II, § 1, cl. 3; *id.* amend. XII. The States are left to determine the manner of their elections. State officials, and not federal ones, prepare the elections, conduct them, assemble the ballots, count the votes, and certify the results. No doubt this is why the defendant, Mr. Trump, and other codefendants spent enormous time and effort contacting, cajoling,

persuading, and otherwise interacting with State officials in the relevant time period: because the President himself *had no authority of his own* in the administration of the election. Federal removal is designed to protect federal functions from State interference, but that was not a risk in 2020 or 2021 and is not a risk now. Instead, this case concerns attempts to interfere in *State* functions by *federal* officials without any authority of their own.

Second, even if the defendant somehow had been acting as authorized under federal law (rather than directly contrary to it), that authority would be negated by the evidence of his "personal interest, malice, actual criminal intent" or any motivation "for any other reason than to do his duty as he saw it." *Id.* The audio of the phone call to Secretary Raffensperger alone demonstrates that the defendant shared a "personal interest" with Mr. Trump in seeing the Trump campaign achieve its goal of reversing Trump's electoral loss in Georgia; it also demonstrates the defendant's actual criminal intent in participating in the solicitation of the violation of the Secretary's oath of office by "finding votes" or otherwise changing the outcome of the election. Additionally, Count 1, Act 96 demonstrates the defendant's explicit, personal interest in these matters: he asked a state official *whether the Trump campaign could pay to "speed up" a signature verification audit* in order to complete it prior to January 6. The defendant cannot plausibly argue that these

activities were somehow "authorized" by federal law when there is evidence demonstrating his personal interest, criminal intent, and overall motivations "for any other reason than to do his duty as he saw it," particularly when he has admitted that the activities were clearly political and tied to the "vigorous and tireless" advocacy in favor of Trump's election.[6]

Third, the defendant cannot plausibly argue that he did no more than that which was "necessary and proper" for him to do. "For conduct to be 'necessary and proper,' an officer must subjectively believe that his actions were appropriate to carry out his federal duties, and that belief must be objectively reasonable." *Texas v. Kleinert*, 855 F.3d 305, 314 (5th Cir. 2017). As shown above, there is no authority anywhere for the President or his Chief of Staff to insert themselves into the electoral processes of the state of Georgia, meaning none of the defendant's actions were either necessary or proper. "The Office of the President has no preference for who occupies it…A function of the presidency therefore is *not* to secure or perpetuate

---

[6] Other Circuits have similarly looked to the presence of any "personal interest" in a defendant's actions, or any reason for a defendant's action aside from the proper discharge of their federal duties. *See Texas v. Kleinert*, 855 F.3d 305, 317 (5th Cir. 2017) (officer in foot chase did not take action "out of personal interest"); *Reed v. Madden*, 87 F.2d 846, 851 (8th Cir. 1937) (officer believed "in good faith" that his life and others were in danger); *Clifton v. Cox*, 549 F.2d 722, 728 (9th Cir. 1977) (officer's belief in necessity of his actions was objectively reasonable where he did not "otherwise act out of malice or with some criminal intent").

incumbency." *Thompson*, 590 F. Supp. at 82 (emphasis original). The defendant points to nothing supporting a conclusion that could demonstrate why it would be "objectively reasonable" to believe that his duties as Chief of Staff included acting on behalf of the Trump campaign, pressuring state officials, or pursuing unlawful strategies designed to ensure Mr. Trump's reelection. Even if there were some authority supporting the defendant's actions, violating state law for a purported federal purpose "must be the rare exception" and in every case must be "clearly seen to be reasonable, necessary, and proper." *Id.* at 1351. It is not enough to merely say that the defendant acted at the behest of or in service to the person who was President at the time. "Presidents and other officials face a variety of demands on their time,…some private, some political, and some as a result of official duty." *Clinton v. Jones*, 520 U.S. 681, 705 n.40 (1997). A claim of immunity for unofficial acts cannot be "grounded purely in the identity of [the President's] office." *Id.* at 695. There is no demonstrable basis for federal authority related to the defendant's actions, while there is ample evidence of personal, political, unofficial intentions and activities.[7]

_____

[7] This case is also not one where the defendant was a federal law enforcement officer forced to make some kind of split-second decision. *Compare New York v. Tanella*, 374 F.3d 141, 144 (2d Cir. 2004) (activities arising from a physical fight in course of official duty) *with Whitehead v. Senkowski*, 943 F.2d 230 (2d. Cir. 1991) (official accused of grand larceny). *See also North Carolina v. Ivory*, 906

Finally, to the extent that the defendant seeks to claim that his Supremacy Clause immunity defense could be plausible because all his overt acts in Count 1 of the Indictment are somehow within the scope of his duties and necessary and proper for their execution, the defendant misapprehends the nature of Georgia RICO law and conspiracy law generally. An overt act "need not be a crime in itself." *McCright v. State*, 176 Ga. App. 486, 487 (1985); *see also Iannelli v. United States*, 420 U.S. 770, 785 n.17 (1975) (overt act may be "innocent in nature, provided it furthers the purpose of the conspiracy"). Thus, arguing that some or even all of the alleged overt acts are not "per se criminal" does not demonstrate that Meadows cannot remain a part of a RICO enterprise. Additionally, there are two elements to a conventional conspiracy: "an agreement and an overt act." *McCright*, 176 Ga. App. at 486. That overt act may be committed by anyone else in the conspiracy, and every conspirator is jointly responsible for the acts of every other conspirator. *Whaley v. State*, 343 Ga. App. 701, 704 (2017).[8] In order for his Supremacy Clause immunity defense to apply

---

F.2d 999, 1003 (4th Cir. 1990) (no "exigency" stemming from official duty that authorized violation of state law); *North Carolina v. Cisneros*, 947 F.2d 1135, 1140 (4th Cir. 1991) (same); *Reed*, 87 F.2d at 851 (officer made split-second decision in good faith); *Clifton*, 549 F.2d at 728 (mistaken shooting of fleeing suspect made on objectively reasonable belief).

[8] As O.C.G.A. 16-14-4(c)(1) provides, a person violates Georgia's RICO law when "[h]e or she together with one or more persons conspires to violate any of the provisions of subsection (a) or (b) of this Code section and *any one or more of*

to the RICO charge, the defendant must show that the actions demonstrating his participation in the *agreement* were authorized, necessary, and proper. He has not done so, and he cannot do so because, as the Indictment alleges, he associated with the other defendants for an unlawful purpose. Indictment at 13-14.

The defendant's actions, which he has admitted constituted improper political activity, were outside the lawful scope of his duties. He has pointed to no federal authority that would authorize his actions. He has demonstrated no basis for an objectively reasonable belief that his actions were necessary and proper to perform his duties, while evidence demonstrates that he had personal or criminal motivations for acting. He has not shown how his participation in a RICO enterprise that conspired to overturn an election had any relationship to his official duties, much less how his participation in such an agreement was necessary for him to perform as a Chief of Staff. For all of these reasons, the defendant cannot plausibly raise a Supremacy Clause immunity defense, and his Notice of Removal must fail.

## CONCLUSION

The defendant has been indicted for joining a common plan to overturn a lawful election and for asking a state official to violate his oath of office by altering

---

*such persons commits any overt act* to effect the object of the conspiracy" (emphasis added).

election returns. His indictment is the result of activities taken by him solely to advance the personal and electoral interests of Donald J. Trump. He can point to no legal basis authorizing his actions as part of his "official duties" as Chief of Staff, and he does not even attempt to explain how his activities could be lawful under the Hatch Act. The defendant's actions were not made under "color of his office" and do not support a claim of Supremacy Clause immunity. Instead, they demonstrate his characteristic disregard for the proper scope of his duties as a federal official. For all of these reasons, the State of Georgia respectfully requests that this Court find that removal should not be permitted in this case.

Respectfully submitted, this 23rd day of August 2023.

FANI T. WILLIS
DISTRICT ATTORNEY
ATLANTA JUDICIAL CIRCUIT

By: *s/ F. McDonald Wakeford*
F. McDonald Wakeford
Chief Senior Assistant District Attorney
Atlanta Judicial Circuit
Georgia Bar No. 414898
136 Pryor Street SW, Third Floor
Atlanta, Georgia 30303
fmcdonald.wakeford@fultoncountyga.gov

<u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel hereby certifies that this pleading complies with the Local Rules of this Court, including Local Rules 5.1.C and 7.1.D (N.D. Ga.) in that it is double-spaced and composed in 14-point Times New Roman font.

This 23rd day of August 2023.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify the foregoing was served upon the following by email:

Joseph M. Englert
McGuire Woods LLP
1230 Peachtree Street NE, Suite 2100
Atlanta GA 30309
(404) 443-5500
jenglert@mcguirewoods.com

George J. Terwilliger
John S. Moran
Michael Francisco
McGuire Woods LLP
888 16th Street NW, Suite 500
Washington, DC 20006
(202) 857-1700
gterwilliger@mcguirewoods.com
jmoran@mcguirewoods.com
mfrancisco@mcguirewoods.com

Dated this 23rd day of August, 2023.

<i>s/ F. McDonald Wakeford</i><br>F. McDonald Wakeford

22