IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| THE STATE OF GEORGIA, | )<br>)<br>) |
| v. | ) Case No. 1:23-cv-03621-SCJ<br>) |
| MARK R. MEADOWS, | )<br>) |
| *Defendant.* | )<br>) |

**REPLY OF DEFENDANT MARK R. MEADOWS TO THE STATE OF GEORGIA'S RESPONSE TO HIS NOTICE OF REMOVAL**

The State opposes removal because, in their view, Mr. Meadows did not act in his official capacity as Chief of Staff when he set up a call between the President and Georgia Secretary of State and took other actions alleged in the Indictment. Thus, they say, those actions had no "connection" to his official duties,[1] and Mr. Meadows does not have even a "colorable defense."[2] The State is wrong.

There is no "election" or "politics" exception to the Supremacy Clause or the Federal Officer Removal Statute, and the State mischaracterizes federal law and the Chief of Staff's role. In any event, the State's arguments about Mr. Meadows's

---

[1] Opp. at 5 (conceding that removal "requires only a 'connection' or 'association,'" which is "not typically a high bar to clear") (quoting *Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1144 (11th Cir. 2017)).
[2] Opp. at 14 (acknowledging that "'colorable'" simply "means 'plausible'") (quoting *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996)).

1

conduct and federal authority are properly considered *once the case is removed*, not on the threshold question of removal, which presents a "quite low" bar, *Caver v. Cent. Alabama Elec. Coop.*, 845 F.3d 1135, 1144 (11th Cir. 2017) (internal quotation omitted). The Court should permit removal at or promptly after Monday's hearing.

*   *   *   *   *

On Monday, August 14, 2023, the State charged Mr. Meadows on two state-law counts as part of a 19-defendant, 41-count case under the Georgia RICO Act, O.C.G.A. § 16-14-4(c). *See* Indictment, Dkt. No. 1-1. Mr. Meadows promptly removed under the Federal Officer Removal Statute, 28 U.S.C. § 1442, the following day, Tuesday, August 15. *See* Notice of Removal, Dkt. No. 1. This Court declined summary remand on Wednesday, August 16, and set an evidentiary hearing for Monday, August 28, consistent with 18 U.S.C. § 1455(b)(5). *See* Order, Dkt. No. 6. The State has now responded to the Notice of Removal. *See* Dkt. No. 27.

**I.    Mr. Meadows Has Met the Low Threshold for Removal**

Mr. Meadows is entitled to removal under 28 U.S.C. § 1442(a)(1) because he has met the very low threshold for removal by a federal official. It is undisputed that Mr. Meadows served as a federal official during the relevant period—specifically, as Chief of Staff to the President of the United States. To obtain removal, he needs only to (1) "show 'a causal connection between what [he] has done under asserted

official authority and the action against him,'" *Caver v. Cent. Alabama Elec. Coop.*, 845 F.3d 1135, 1142 (11th Cir. 2017) (quoting *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996)), and (2) "raise a colorable federal defense," *id*. Those are easy showings to make, and Mr. Meadows has made them.

***First***, it is clear from the Notice of Removal, the Indictment, and even the State's Response that there is at least some causal connection between the conduct charged and Mr. Meadows's role as Chief of Staff. The charged conduct all occurred during his tenure and as part of his service in that role. The conduct alleged in the Indictment plainly came about because Mr. Meadows was serving as Chief of Staff to then-President Donald J. Trump, and the Chief of Staff has broad-ranging duties to advise and assist the President. This is not a case where the defendant was plainly "acting on a frolic of their own which had no relevancy of their official duties." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969) (internal quotation omitted). And even that is how the State wishes to characterize it, Mr. Meadows "should have the opportunity to present [his] version of the facts to a federal, not a state, court," since "[t]his is exactly what the removal statute was designed to accomplish." *Id.* at 409.

The lenient "connection" standard derives from the broad language of the Federal Officer Removal Statute, which covers any claims "for or relating to any act" under color of federal office. 28 U.S.C. § 1442(a)(1). As the Eleventh Circuit

has held, "[t]he phrase 'relating to' is broad and requires only a 'connection' or 'association' between the act in question and the federal office." *Caver*, 845 F.3d at 1144 (internal quotation omitted). While the State disputes whether Mr. Meadows's conduct was actually required or properly considered part of his official duties, those arguments are more relevant to the separate issue of immunity; they do not negate a finding that the conduct had a connection to Mr. Meadows's official duties.

**Second**, Mr. Meadows "raise[s] a colorable federal defense." *Caver*, 845 F.3d at 1142. The Eleventh Circuit "gives this portion of § 1442(a)(1) a broad reading so as to encompass all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law." *Id.* at 1145 (cleaned up). In deciding removal, the Court need not—indeed cannot—adjudicate the immunity defense on the merits. A colorable "defense need only be plausible; its ultimate validity is not to be determined at the time of removal." *Magnin*, 91 F.3d at 1427; *see also Caver*, 845 F.3d at 1145 (11th Cir. 2017) ("The law does not require that the removing defendant virtually win his case before it can be removed."); *see* Opp. at 14.

Here again, Mr. Meadows has cleared the low bar for removal. It is undisputed that the Supremacy Clause provides immunity from "suits under state law against federal officials carrying out their executive duties," *Kordash v. United States*, 51 F.4th 1289, 1293 (11th Cir. 2022), including former federal officials who served at

4

the time of their alleged conduct, *see Maryland v. Soper*, 270 U.S. 9, 34–35 (1926); *Camero v. Kostos*, 253 F. Supp. 331, 335 (D.N.J. 1966). And again, it is undisputed that Mr. Meadows was a federal official at the time of the charged conduct.

The only dispute the State asserts here is whether Mr. Meadows is entitled to immunity based on the nature of the conduct charged and the scope of his duties. To the extent that dispute might require resolution, it does not preclude the antecedent removal for which the statute broadly provides. On the merits, immunity turns on "whether a federal official's acts have some nexus with furthering federal policy and can reasonably be characterized as complying with the full range of federal law." *Kordash*, 51 F.4th at 1293 (internal quotation omitted). Thus, even at that stage, the federal official need not prove that he stayed within his lawful authority, only that he reasonably believed he was.[3] As to removal, "the lenient colorable federal defense requirement" focuses on the removing official's version of the case, not the State's competing narrative. *Caver*, 845 F.3d at 1145–46. Again, the Court "need not . . . determine the merits of that position" in order to reach removal. *Id.* at 1146.

II. **The State's Arguments for a "Political Exception" to the Supremacy Clause Are Without Legal Basis and Therefore Unpersuasive**

While the State's characterization of Mr. Meadows's conduct and official

---

[3] A federal-law violation defeats immunity only when it was clear and willful. *See, e.g., Baucom v. Martin*, 677 F.2d 1346, 1350 (11th Cir. 1982).

duties are largely irrelevant at the removal stage, they are also wrong. Neither the duties of the Chief of Staff nor the laws and Constitution of the United States draw a clean line between federal authority, on the one hand, and elections and politics, on the other. Indeed, creating an "election" or "politics" exception to removal and official immunity would have sweeping consequences for the role of the Chief of Staff and the operation of the Federal Government going forward.

While the Court need not resolve the State's arguments against immunity to effecuate removal, those arguments miss the mark. The State's myriad specific arguments boil down to two general ones: (a) that there is no federal authority to be involved in "political" activity involving Georgia's presidential election, and (2) that Mr. Meadows acted out of a personal interest to see the President reelected.

### A.  Elections and Politics Do Not Fall Beyond Federal Authority

The State argues repeatedly that Mr. Meadows has no immunity if his conduct related to Georgia's administration of the 2020 Presidential Election or involved "politics." *See* Opp. at 15 (describing Mr. Meadows's conduct as "'unquestionably political' in nature and therefore, by definition, outside the lawful scope of his authority as Chief of Staff");[4] *id.* ("[T]he activities in which he assisted Mr. Trump

---

[4] The State does not provide a definition of "political" or "the lawful scope of [the] authority [of the] Chief of Staff." *See id.*

6

were all 'unofficial' activities concerning his efforts to remain in office for a second term, and there is no authority for a president or his chief of staff to take any actions concerning the administration of a presidential election."); *id.* at 16 ("[T]he President himself *had no authority of his own* in the administration of the election.").

That notion is fundamentally flawed for several reasons.

***First***, contrary to the theme of the State's response, the Federal Government has a substantial interest in the proper administration of federal elections, even though the States also play an important role. *See, e.g.*, Electoral Count Act, 3 U.S.C. § 5, et. seq. (1887) (governing process for electoral vote counting and certification by the States); Voting Rights Act, 52 U.S.C. § 10301, et seq. (1965) (illegal to deny or restrict voting rights because of a citizen's race); National Voter Registration Act, 52 U.S.C. § 20501, et seq. (1993) (requires most states to allow registration to vote by mail); Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20301, et. seq. (1999) (governing right to register and vote absentee in federal elections); Help America Vote Act, 52 U.S.C. § 20901, et seq. (2002) (requiring use of provisional ballots in federal elections); *see generally* U.S. Code, Title 52 ("Voting and Elections").[5]

---

[5] *See also Bush v. Gore*, 531 U.S. 98, 100 (2000) (addressing post-election challenge to counting of ballots and election procedures in Presidential election); *Bush v. Palm Beach Cnty. Canvassing Bd.*, 531 U.S. 70, 73 (2000) (addressing whether "changing

***Second***, contrary to the State's claim, the Hatch Act does not put Mr. Meadows's charged conduct beyond the scope of his official duties and thus beyond a "colorable" immunity defense. The Hatch Act is a red herring, particularly at this stage. Any dispute about the Hatch Act is a proper matter for the federal court *after* removal. Nonetheless, Mr. Meadows complied with federal law in connection with the charged conduct, and neither OSC, nor DOJ, nor any other competent federal enforcement authority has suggested otherwise despite the intense focus and public nature of the alleged acts.[6]

---

the State's elector appointment procedures after election day, violated the Due Process Clause or 3 U.S.C. § 5 [Electoral Count Act], and whether the decision of that court changed the manner in which the State's electors are to be selected, in violation of the legislature's power to designate the manner for selection under Art. II, § 1, cl. 2"); Lisa Marshall Manheim, *Presidential Control of Elections*, 74 Vand. L. Rev. 385, 396 (2021) ("In the decentralized system adopted by the United States, the federal government does not itself conduct elections. Instead, elections are run by state and local governments, with limited but important oversight and regulation by the federal government."); U.S. Department of Justice, *Federal Prosecution of Election Offenses* 1 (Richard C. Pilger ed., 8th ed., 2017) ("[T]he effective prosecution of corruption of the election process is a significant federal law enforcement priority."). The Department of Justice includes a Civil Rights Division, Voting Section ("The Voting Section enforces the civil provisions of the federal laws that protect the right to vote."), as well as Criminal and Civil branches (*e.g.*, the Election Crimes Branch) that relate to the litigation of election related offenses.
[6] Vice President Gore's then Chief of Staff recalls that, during the 2000 Florida Recount, he was actively engaged with both the Gore-Lieberman campaign and legal proceedings contesting the election results. *See* Charles Burson, *What Should Have Been*, Daily Beast (Apr. 25, 2017), https://www.thedailybeast.com/what-should-have-been. It would be equally absurd to suggest that violated the Hatch Act.

The State points to an Office of Special Counsel report, Dkt. 27-4, Ex. D ("Report"), that discusses "three interviews" Mr. Meadows gave *before* election day about conduct *entirely unrelated* to the conduct charged here. Even as to those speeches, the OSC report acknowledges that the White House Counsel's Office defended Mr. Meadows, arguing that "*the Hatch Act does not apply*" and that OSC's findings would "violate employee's free speech rights under the First Amendment." Report at 27 (emphasis added). OSC also acknowledges that for commissioned officers like the Chief of Staff, it "may only submit a report to the president"; it does not have enforcement authority. Report at 2.

***Third***, the State cannot draw a meaningful distinction between the official responsibilities of the President and those of other federal officials whose duties indisputably relate to the administration of elections. Under the Federal Constitution, "the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183, 2191 (2020) (plurality opinion) (quoting U.S. Const. art. II, § 1, cl. 1; *id.* art. II, § 3, cl. 3). The President "cannot delegate ultimate responsibility or the active obligation to supervise that goes with it." *Free Enter. Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477, 496 (2010)

(internal quotation omitted). Thus, nothing is beyond the scope of the President's duty unless it is beyond the duty of the entire Executive Branch.

Indeed, even if elections and "politics" *were* beyond the authority of the entire Executive Branch, the President (and by extension, his Chief of Staff) would still appropriately inquire into them to the extent they fall within *Congress's* authority. Under Article I, "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but *the Congress may at any time by Law make or alter such Regulations*, except as to the Places of chusing Senators." U.S. Const., art. I, § 4, cl. 1 (emphasis added). The President, in turn, plays a constitutional role in supporting this congressional function; Article II provides that the President "shall from time to time give to the Congress Information of the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient." *Id.*, art. II, § 3.[7] Thus, even for matters committed exclusively to Congress, the President still has authority—and indeed a duty—to inquire and to make recommendations.

---

[7] Indeed, "[t]he Framers considered, and rejected, making it optional for the President to recommend legislation to Congress . . . apparently concerned that the President would refrain from engaging with Congress on important issues out of fear that Congress would resent the intrusion on its legislative power and exact political revenge." Benjamin J. Schwartz, *The Recommendations Clause and the President's Role in Legislation*, 168 U. Pa. L. Rev. 767, 770–71 (2020).

***Finally***, the State conflates (i) the distinction between the President's official and unofficial duties, including as a candidate, and (ii) the Chief of Staff's duties as the his principal assistant and advisor. *See* Opp. at 15 ("[T]he activities in which [Mr. Meadows] assisted Mr. Trump were all 'unofficial' activities concerning his efforts to remain in office for a second term, and there is no authority for a president or his chief of staff to take any actions concerning the administration of a presidential election.").[8] As Chief of Staff, Mr. Meadows did not stop assisting the President just because the President was doing something personal or political. To take one example, certain White House personnel *must* travel with the President and do so in their official capacities, even when the President travels to a campaign rally; one such essential traveler is the Chief of Staff, or his designee. One would not say the pilot of Air Force One ceases to be a military official when he flies the President to an unofficial event. The same goes for the Chief of Staff. They do not take off their "official" hats just because the President takes off his.

## B.   The "Personal Interest" Principle Does Not Apply Here

The State also cannot stop removal by alleging that Mr. Meadows acted out of a "personal interest" in seeing President Trump reelected. Opp. at 15 (quoting

---

[8] The latter point is so obviously belied by numerous such sources of authority, but the State's position also ignores the Chief of Staff's critical role of assisting the President comprehensively.

*Baucom*, 677 F.2d at 1350). None of the four cases the State cites involve an alleged distinction between political and official duties, and they are wholly inapposite here.

*Baucom*, the one Eleventh Circuit case, involved an FBI special agent who "had participated during the course of an investigation in an alleged bribery attempt of a [Georgia] state prosecutor." 677 F.2d at 1347. The Court of Appeals held that he was immune, even though he willfully violated Georgia law, because "his acts in the bribery scheme were within his authority as an FBI agent, and . . . any state conviction of him for those acts would contravene the Supremacy Clause of the Constitution of the United States." *Id*. The State cites a passage from the court's admonition that "[e]ven if the officer makes an error in judgment in what the officer conceives to be his legal duty, that alone will not serve to create criminal responsibility in a federal officer." *Id.* at 1350. The court found "no suggestion that Baucom acted because of any personal interest, malice, actual criminal intent, or for any other reason than to do his duty as he saw it. His good faith cannot be seriously questioned." *Id*. *Baucom* does not remotely suggest that Mr. Meadows loses immunity if he wanted the President to be reelected. Rather, *Baucom* supports removal—and immunity—because it shows that he is protected so long as he had a good-faith belief, even mistaken, that his conduct was within "his duty as he saw it."

The three out-of-circuit cases are equally unavailing. In *Texas v. Kleinert*, 855 F.3d 305 (5th Cir. 2017), the Fifth Circuit affirmed dismissal of state manslaughter charges against a federal task force officer; the court noted that "none of the evidence suggests that Kleinert acted out of personal interest or bore any ill will toward [the suspect he shot]." *Id.* at 317. In *Reed v. Madden*, 87 F.2d 846 (8th Cir. 1937), the Eighth Circuit reversed denial of habeas relief to a federal agent indicted for manslaughter; the court noted "that [Reed], in good faith, believed that his life and the lives of those for whose presence he felt responsible were in danger, and that the action complained of here was taken in that belief." *Id.* at 851. And in *Clifton v. Cox*, 549 F.2d 722 (9th Cir. 1977), the Ninth Circuit affirmed habeas relief to a federal agent charged with second-degree murder and involuntary manslaughter for a fatal shooting during a drug raid; in discussing the Ninth Circuit standard for Supremacy Clause immunity, the court stated that "[e]ssential to this determination, assuming the truth of the state's evidence, is whether the official employs means which he cannot honestly consider reasonable in discharging his duties or otherwise acts out of malice or with some criminal intent." *Id.* at 728.

Each case turned on whether the federal official fired the fatal shot in a good-faith exercise of federal duties as opposed to out of criminal malice. They have nothing to do with the supposed line between official federal duties and unofficial

political activity. Nor do they remotely suggest that Mr. Meadows cannot claim immunity if he wanted the President to be reelected. *Cf.* Opp. at 16 ("[T]he defendant shared a 'personal interest' with Mr. Trump in seeing the Trump campaign achieve its goal of reversing Trump's electoral loss in Georgia."). Like *Baucom*, these cases further support immunity (and thus also show at least a "colorable" defense for purposes of removal) because they reinforce that Mr. Meadows need not prove that his conduct complied with federal law in retrospect; he is entitled to immunity because he acted in good faith to further what he understood to be his official duties.

### III. The Allegedly Broad Scope of the Georgia RICO Act Is Irrelevant

The State finally argues that Mr. Meadows "misapprehends the nature of Georgia RICO law and conspiracy law generally," under which, it says, "[a]n overt act 'need not be a crime in itself.'" Opp. at 19 (quoting *McCright v. State*, 176 Ga. App. 486, 487 (1985); citing *Iannelli v. United States*, 420 U.S. 770, 785 n.17 (1975)). That alleged misapprehension is irrelevant. Under *Neagle*, "entitlement to Supremacy Clause immunity is to be ascertained by looking only at federal law"; the whole point is that a federal official carrying out his duties is not "obliged to consider state criminal law at all before acting." Seth P. Waxman & Trevor W.

Morrison, *What Kind of Immunity? Federal Officers, State Criminal Law, and the Supremacy Clause*, 112 YALE L.J. 2195, 2233 (2003).[9]

Of course, the State does not cite a single case suggesting that it can overcome removal under 28 U.S.C. § 1442(a)(1) by charging a federal official under a state criminal statute that does not require a criminal act. There is no such case. Indeed, the State's apparently sweeping theory of liability only further underscores the importance of removal. Supremacy Clause immunity and the Federal Officer Removal Statute protect against, among other things, the risk that a State "may administer not only the laws of the State, but equally Federal law, in such a manner as to paralyze the operations of the government." *Tennessee v. Davis*, 100 U.S. 257, 263 (1879). The State's assertion of the broad scope of the Georgia RICO Act against a White House Chief of Staff should be tested in federal court, not in state court.

*     *     *     *     *

The Court should therefore promptly remove Mr. Meadows's case and so notify the state court pursuant to 28 U.S.C. § 1455(b)(5).

---

[9] *See also Johnson v. Maryland*, 254 U.S. 51, 56–57 (1920) (holding that immunity applies to "even the most unquestionable and most universally applicable of state laws, such as those concerning murder"); *Ohio v. Thomas*, 173 U.S. 276, 283 (1899) ("[F]ederal officers who are discharging their duties in a state . . . are not subject to the jurisdiction of the state in regard to those very matters of administration which are thus approved by federal authority.").

15

Dated: August 25, 2023

Joseph M. Englert
MCGUIREWOODS LLP
1230 Peachtree St., N.E., Suite 2100
Atlanta, GA 30309
(404) 443-5500
Jenglert@mcguirewoods.com

Respectfully submitted,

*/s/ George J. Terwilliger III*

George J. Terwilliger, III*
John S. Moran*
Michael Francisco*
MCGUIREWOODS LLP
888 16th Street NW, Suite 500
Washington, DC 20006
(202) 857-1700
gterwilliger@mcguirewoods.com
jmoran@mcguirewoods.com
mfrancisco@mcguirewoods.com
* Admitted *Pro Hac Vice*

*Counsel to Mark R. Meadow*

**CERTIFICATE OF SERVICE**

On August 25, 2023, the foregoing ***Reply of Defendant Mark R. Meadows to the State of Georgia's Response to His Notice of Removal*** was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record. A courtesy copy will also be provided by email to the attorneys for the other defendant who contacted chambers today and suggested a postponement of the hearing, since these attorneys have not yet entered an appearance in this case.

This, the 25th day of August, 2023.


 /s/ John S. Moran

John S. Moran*
MCGUIREWOODS LLP
888 16th Street NW, Suite 500
Washington, DC 20006
(202) 857-1700
jmoran@mcguirewoods.com
* Admitted *Pro Hac Vice*

## **CERTIFICATE OF COMPLIANCE**

The undersigned certifies that 14-point Times New Roman font was used for this document and that it has been formatted in compliance with Local Rule 5.1.

This, the 25th day of August, 2023.

  /s/ John S. Moran

John S. Moran*
MCGUIREWOODS LLP
888 16th Street NW, Suite 500
Washington, DC 20006
(202) 857-1700
jmoran@mcguirewoods.com
* Admitted *Pro Hac Vice*