IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

|  |  |
|---|---|
| THE STATE OF GEORGIA, | ) )  ) |
| v. | ) ) Case No. 1:23-cv-03621-SCJ |
| MARK R. MEADOWS, | ) ) ) |
| *Defendant*. | ) ) |

**SUPPLEMENTAL BRIEF OF DEFENDANT MARK R. MEADOWS
IN SUPPORT OF HIS NOTICE OF REMOVAL**

The Court has asked for supplemental briefing on whether "a finding that at least one (but not all) of the overt acts charged occurred under the color of Meadows's office [would] be sufficient for federal removal." The answer is "***yes***."

**I.   Removal Is Required If the "Prosecution" Relates to "Any Act" That Occurred in the Course of Official Duties**

Statutory text, binding precedent, and hornbook law confirm that a prosecution is removable if any part relates to an "act under color of [federal] office." 28 U.S.C. § 1442(a)(1). Removal is thus required if at least one overt act charged has "a 'connection' or 'association,'" *Caver v. Cent. Alabama Elec. Coop.*, 845 F.3d 1135, 1144 (11th Cir. 2017), to even "the outer perimeter of [Mr. Meadows's] line of duty," *Barr v. Matteo*, 360 U.S. 564, 575 (1959).

***Statutory Text***. Two particular aspects of the statutory text confirm this

1

principle: (a) the Federal Officer Removal Statute refers to removal of "[a] civil action or criminal prosecution," not of particular claims, counts, or theories;[1] and (b) it authorizes removal of prosecutions "against or directed to" a federal officer "for or relating to ***any act*** under color of [federal] office." 28 U.S.C. § 1442(a) (emphasis added).[2] The statutory text itself thus shows that the case would be removable if some but not all of the charged conduct related to Mr. Meadows's official duties.

***Binding Precedent***. The Fulton County District Attorney knows from recent experience "that if one claim cognizable . . . is present, the entire action is removed, regardless of the relationship between the Section 1442 claim and the non-removable claims." *Georgia v. Heinze*, 637 F. Supp. 3d 1316, 1325–26 & n.8 (N.D. Ga. 2022) (denying remand of charges by Fulton County District Attorney against federal task force officers).[3]

---

[1] Federal courts similarly construe 28 U.S.C. § 1441, which provides for removal of a "civil action" over which federal jurisdiction exists. *See, e.g.*, *Ladies Mem'l Ass'n Inc. v. City of Pensacola, Fla.*, No. 3:20CV5681/MCR/ZCB, 2023 WL 2561785, at *3 (N.D. Fla. Mar. 17, 2023) ("If the complaint contains 'even one federal claim[,]' then the defendant has 'the right to remove the entire case to federal court.'") (quoting *Convent Corp. v. City of N. Little Rock*, 784 F.3d 479, 483 (8th Cir. 2015)).

[2] *See Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 257 (4th Cir. 2017) (requiring removal where an officer asserts a federal defense to even one claim).

[3] The State argued the officers "could not be acting under color of federal authority because they violated the Fourth Amendment," *id.* at 1324—much like the argument here based on the Hatch Act. The *Heinze* Court rejected the argument, holding that it "concern[ed] the merits of the criminal charges . . . and [was] irrelevant to whether the Defendants acted under the color of federal authority for removal purposes." *Id*.

This proposition is binding precedent under *Nadler v. Mann*, 951 F.2d 301, 305 n.9 (11th Cir. 1992). There, the Eleventh Circuit addressed jurisdiction under § 1442(a)(1) and immunity under the Liability Reform Act, 28 U.S.C. § 2679, in a defamation case against an Assistant U.S. Attorney who was also a candidate for judicial office. On immunity, the Court concluded—under a state-law standard inapplicable here—that arranging a meeting between a whistleblower and the FBI was an official act but that leaking the investigation to the press was not. *See Nadler*, 951 F.2d at 305–06. On removal, however, the Court made clear that the entire case was appropriately removed, quoting the same language used in *Heinze*. *See id.* at 306 & n.9. *Nadler* thus makes clear that the Court must permit removal if any (not necessarily all) of the charged conduct relates to Mr. Meadows's official duties.

Many other federal courts agree. *See, e.g.*, *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 945 (7th Cir. 2020) ("Assuming for the sake of argument that some of the [plaintiff's] allegations . . . do not relate to the [defendants'] acts under color of federal office, 'removal need not be justified as to all claims . . . ; rather, the defense need only apply to one claim to remove the case."); *Morgan v. Huntington Ingalls, Inc.*, 879 F.3d 602 (5th Cir. 2018); *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 257 (4th Cir. 2017); *see also Mesa v. California*, 489 U.S. 1, 129 (1989) ("[I]f there be a single such ingredient in the mass, it is sufficient."). Indeed, Mr. Meadows is

3

aware of *no* case refusing removal because the action or prosecution involved a mix of official and unofficial conduct. *Cf. Sawyer*, 860 F.3d at 257 (reversing remand order involving "mixed" claims).[4]

***Hornbook Law***. Lastly, it is hornbook law that § 1442(a)(1) "authorizes removal . . . even if only one of the controversies it raises involves a federal officer." Wright & Miller, Federal Practice and Procedure § 3726 (rev. 4th ed. 2009).

## II.   The State's Framing of the Case Does Not Control Removal

Removal is also required, even if the State has charged some acts beyond Mr. Meadows's official duties, because what controls is Mr. Meadows's articulation of his federal defense, not the State's articulation of its state charges. *See Kircher v. Putnam Funds Tr.*, 547 U.S. 633, 644 (2006) (explaining that § 1442(a) "is an exception to the 'well-pleaded complaint' rule" and allows "'suits against federal officers [to] be removed despite the nonfederal cast of the complaint'") (quoting *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1,

---

[4] Justice Scalia's partial dissent in *Jefferson County v. Acker*, 527 U.S. 423 (1999), which the State cites in a footnote, *see* State Supp. Br., Dkt. No. 66, at 5 n.2, is not to the contrary. There, Justice Scalia argued that an "officer should have to identify as the gravamen of the suit an act that was, if not required by, at least closely connected with, the performance of his official functions." *Id.* at 447 (Scalia, J., concurring in part, dissenting in part). Mr. Meadows would meet that standard, but in any event, the Supreme Court did not adopt it. *See id.* at 433 (majority opinion). The Court was also addressing the level of connection needed between a claim and an official act, not how to treat removal of "mixed" claims.

10 (1983); *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999)).[5] The State's extended analysis of its theory of liability under the Georgia RICO Act, *see* State Supp. Br., Dkt. No. 66, at 2–7, 11 & n.7, 13–14, is thus beside the point.

The State also cannot avoid removal by charging a mix of removable and non-removable conduct. Any contrary rule would lead to absurd results; a State could charge even the most quintessential official act and defeat removal by tacking on unofficial conduct. That would reflect a "narrow, grudging" interpretation the Supreme Court has rejected, *Willingham v. Morgan*, 395 U.S. 402, 407 (1969), and would invert "the presumption under the federal officer removal statute [which] favors removal, for the benefit of the federal officer involved the case," *In re Asbestos Prod. Liab. Litig. (No. VI)*, 770 F. Supp. 2d 736, 741 (E.D. Pa. 2011).

Federal courts have even held that a plaintiff (or here, the State) cannot evade removal by expressly disclaiming *any* reliance on official acts. *See* WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, *supra*, § 3726;[6] *Asbestos Prod. Liab.*

---

[5] Even after removal, "entitlement to Supremacy Clause immunity is to be ascertained by looking only at federal law." S. Waxman & T. Morrison, *What Kind of Immunity? Federal Officers, State Criminal Law, and the Supremacy Clause*, 112 YALE L.J. 2195, 2233 (2003); *see Johnson v. Maryland*, 254 U.S. 51, 56–57 (1920).
[6] *Id.* (explaining that "purported disclaimers" of reliance on official acts are "ineffective, as impermissibly attempting to deprive federal officers of their right to have jurisdiction under the federal officer removal statute determined by a federal court under the requirements established by Section 1442").

*Litig.*, 770 F. Supp. 2d at 741–43. This case could therefore be removed even if the Indictment alleged *no* acts by Mr. Meadows and charged only, for example, that he had joined a RICO conspiracy. Normally, "an action may be removed . . . only if a federal district court would have original jurisdiction," which means that any "federal question . . . must appear on the face of a properly pleaded complaint" and "an anticipated or actual federal defense generally does not qualify a case for removal." *Jefferson Cnty.*, 527 U.S. at 430–31. But federal officer removal is "exceptional in this regard. . . . [S]uits against federal officers may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Id.* at 431. Here, Mr. Meadows has pleaded a connection to his official duties and asserted a colorable federal defense; that is all he needs to do. *Cf. Heinze*, 637 F. Supp. 3d at 1325 ("The Defendants have alleged that they were acting as federal officers in accordance with federal law and therefore entitled to immunity. That is all that is required.").[7]

---

[7] The State's claim that it could convict without showing that Mr. Meadows took *any* illegal act, *see* Hearing Tr. 253:5–6, Aug. 28, 2023 (hereinafter "Tr."), is irrelevant. Mr. Meadows could still remove by pleading that the State's case related to his federal duties. The fact that the Indictment sets forth multiple acts of specific charged conduct only makes that task simpler. Mr. Meadows needs only to show he had a good-faith belief that he was acting within the scope of his duties, *see Baucom v. Martin*, 677 F.2d 1346, 1350 (11th Cir. 1982); *Kentucky v. Long*, 837 F.2d 727, 744 (6th Cir. 1988), which his unrebutted testimony shows, *see infra* Part III.

6

### III. The Record Makes Clear That the Prosecution Relates to Acts That Occurred in the Course of Mr. Meadows's Official Duties

Under these black-letter legal principles, Mr. Meadows is entitled to removal. His unrebutted testimony establishes the broad scope of his official duties as "Assistant to the President and Chief of Staff,"[8] which may generally be classified in three categories: (A) providing the President close, confidential advice;[9] (B) using his discretion to gather information (including from state and federal officials) on a wide range of federal interests and potential policies to be able to advise the President on a moment's notice;[10] and (C) acting as a "gatekeeper" to the President and managing the President's time to advance federal interests.[11] Managing the President's time was especially critical after Election Day to ensure the federal government continued to function and there was a "peaceful transition of power." Tr. 96:24–25; *see also* Tr. 28:11–30:3 (discussing post-election federal priorities).

---

[8] *See* DX-001 (Presidential Commission).
[9] Tr. 19:23–20:5, 33:14–34:5, 38:23–39:6, 44:23–45:4, 45:8–11, 51:24–52:14, 63:2–10, 81:6–18, 81:19–82:19, 85:3–13.
[10] Tr. 33:22–23 ("There were no rhyme or reason where [the President's] questions might come up."), 34:2–5 ("[H]aving a broad understanding of what was going on was . . . critically important as a senior advisor to the President so that I could anticipate what logistics were needed and what we needed to do."); *see also* Tr. 17:9–18:12 (food shortages, airline bankruptcies, prescription drugs), 20:8–14 (military operations), 23:2–14 (COVID-19), 51:24–52:14 (election integrity), 81:19–82:5 (legislation, executive orders, and election integrity).
[11] Tr. 34:23–35:10, 44:23–44:7, 61:6–14.

7

Mr. Meadows also exercised more specific duties in support of these general functions.[12] He managed the White House staff and regularly coordinated meetings between the President and state and federal officials and outside constituents.[13] He fielded inquiries from people trying to reach the President, to the point that it seemed his "phone number was plastered all over every bathroom wall in America." Tr. 24:11–12. His overarching duty was to ensure that the President could effectively lead the federal government and its operations. Mr. Meadows was thus on duty "24/7," and traveled with the President, or sent a designee, at all times.[14]

Even if the Court were to conclude that *some* charged conduct falls outside Mr. Meadows's official duties,[15] removal would be justified by finding that even one charged act was related. But the record establishes that each charged "Act" in Count I of the Indictment, in fact, relates:

### Act 5 - Michigan Oval Office Meeting

Mr. Meadows considered this part of his role as Chief of Staff, Tr. 44:6–7, and his conduct was consistent with the duties and responsibilities of

---

[12] *See generally* DX-003 (Gast Decl.), ¶¶ 2–6; DX-004 (Williamson Decl.), ¶¶ 3–14.
[13] Tr. 12:4–13:5, 21:12–24, 31:9–18.
[14] Tr. 11:19–16:1.
[15] The Court should not so conclude. The Court need not and should not adjudicate Mr. Meadows's immunity defense in deciding removal; it should determine only whether Mr. Meadows has asserted the requisite connection and a colorable defense. *See Caver*, 845 F.3d at 1142. Moreover, if the Court finds that some conduct relates to Mr. Meadows's official duties, this suffices; opining that other acts might fall beyond his duties would be unnecessary *obiter dictum*.

that role, including managing the President's time,[16] maintaining awareness of matters before the President,[17] maintaining capability to advise the President or delegate to others,[18] monitoring action items that may follow a meeting,[19] addressing the federal interest in free and fair elections,[20] and maintaining awareness of matters that could lead to proposed legislation or executive orders.[21] The State presented no contrary evidence.[22]

### Act 6 – Text Soliciting Phone Number

Mr. Meadows considered this part of his role as Chief of Staff, Tr. 46:24–25, and his conduct was consistent with the duties and

---

[16] Tr. 44:9–13 (describing role in wrapping up meetings), 59:1–2 ("[P]art of me being there in my official capacity would have been to try and assist with time management and wrap-up the meeting . . . .").

[17] Tr. 45, 45:5–7 (describing need to "be aware of what is consuming the President's time or taking his attention").

[18] Tr. 44:25–45:3 ("Certainly as Chief of Staff, again, giving advice to the President, but also making sure that the White House counsel is informed, others being able to give advice to the President.").

[19] Tr. 58:20–21 (describing meetings "where the President might request at a later date something that would happen").

[20] Tr. 59:18–24 ("[F]rom a standpoint of trying to make sure that elections are—are accurate, you know, does that have a federal nexus, I would assume it would have a federal nexus. I mean, we have operations within the federal government that tries to make sure our elections are accurate, whether it's [DHS], DOJ or others.").

[21] Tr. 62:10–16 ("[T]he President . . . often makes recommendations on legislation that could come up, make recommendations on how to make sure elections are safer and secure. There is potential for executive orders . . . . So all of those things would be part of why you would have to be in a meeting like that.").

[22] The State did not move for admission of Michael Shirkey's testimony before the January 6th Select Committee, though the State attached it as an exhibit to its Response brief. Had it, Mr. Meadows would have objected to the transcript as unreliable hearsay. But even if considered, the Shirkey transcript shows only that "Mr Meadows sat on the sofa behind [the participants]" and later took them on a "detailed tour" of the White House, Shirkey Tr., Dkt. No. 27-1, at 15:4–5, 20–21, which corroborates Mr. Meadows's testimony.

responsibilities of that role, namely gathering information (and phone numbers in particular) for the President.[23] Mr. Meadows frequently obtained phone numbers for the President, Tr. 66:14–18, and in this instance, did not know why the President wanted to speak with Pennsylvania legislators, Tr. 66:19–67:15. The State presented no contrary evidence.

### Act 9 – Pennsylvania White House Meeting

Mr. Meadows "was not actually in this meeting," Tr. 48:11–12, but to the extent he was involved at all, it was in his role as Chief of Staff, Tr. 48:4–7. He was called down beforehand to notify visiting legislators of their positive COVID tests. Tr. 48–49. His conduct was consistent with the duties and responsibilities of that role, namely protecting the President's health and physical safety.[24] The State presented no contrary evidence.

### Act 19 – Requesting McEntee Memo

Mr. Meadows "did not ask" Mr. McEntee for this memo, Tr. 50:12; *see also* Tr. 50:7, 51:7–8, but to the extent he was involved at all, it would

---

[23] Tr. 46:24–47:1 ("[C]ertainly, [it was] in my role as Chief of Staff to get additional phone numbers for the President on a variety of individuals."), 47:8–10 ("Just the President wanted the phone number. So I was asked on a pretty regular occasion for numbers."), 66:14–18 ("And getting a phone number for the President of the United States was—was something that I did regularly. And so as Chief of Staff, getting numbers that was not readily available for the White House switchboard, I did on a pretty regular basis.").

[24] Tr. 48:23–49:3 ("I recall going down to—to the cabinet room where they were assembling at that particular point, introduced myself as the Chief of Staff, and then tried to let the individuals know that there was three of them that wouldn't be able to meet with the President because they had—had, you know, come down with a positive COVID test"), 74:6–11 ("[T]he federal role obviously was protecting the President of the United States when I went down to make sure that he was not getting COVID. So security of our Commander in Chief, that was a federal role in me being there. And trying to make sure that we followed . . . White House protocols . . . that I put in place.").

have been in his role as Chief of Staff, Tr. 49:17–19, and it would have been consistent with the duties and responsibilities of that role, including directing and supervising staff of the Office of the President in preparing memos and other tasks,[25] maintaining awareness of matters before the President,[26] and advising the President on matters of federal law, including implementation of the Electoral Count Act, 3 U.S.C. § 15. The State presented no contrary evidence, including no evidence that Mr. Meadows arranged or attended such a meeting; nor did the State introduce a memo prepared by Mr. McEntee.[27]

### Act 92 – Visiting Cobb County Civic Center

Mr. Meadows considered this part of his role as Chief of Staff, Tr. 51:20–23,[28] and his conduct was consistent with the duties and responsibilities of that role, including gathering information about and maintaining awareness of matters the President would likely bring up,[29]

---

[25] Tr. 49:17–19 ("[I]t was common for the Chief of Staff, in his role of Chief of Staff, to ask individuals for memos on a variety of topics, and—and I often did so."), 49:22–23 (identifying McEntee was the principal member of the White House staff responsible for personnel matters).

[26] *See supra* n.17.

[27] The State did not move for admission of Johnny McEntee's testimony before the January 6th Select Committee, though the State attached it as an exhibit to its Response brief. Had it, Mr. Meadows would have objected to the transcript as unreliable hearsay. But even if considered, the McEntee transcript shows only that Mr. McEntee did not "remember" who asked him to write a memo, but "it was probably the President," McEntee Tr., Dkt. No. 27-3, at 144:20–21; that he could not "remember who it was" who asked about the topic, *id.* at 142:21–23; and that he does not recall to whom he gave the memo, *id.* at 145:7–8, none of which shows Mr. Meadows did anything, much less that he exceeded his federal role.

[28] *See also* Tr. 85:7–10 ("I believed I was there supporting the President, as I've mentioned earlier, in my federal role as Chief of Staff, which, bluntly, is to keep him well-informed and well-advised on a variety of issues.").

[29] Tr. 52:9–14 ("I felt like that anticipating where the President would not only ask, but bring it up, . . . to see the actual count in process would keep me well informed so that I could advise the President of what I observed in person instead of reading about it or hearing speculation from other people."), 53:4–7 (explaining that he was

informing and advising the President on matters of concern to manage the President's ability to give time and attention to Presidential duties,[30] and maintaining knowledge about matters that could be subject to proposed legislation or executive orders.[31] The State presented no contrary evidence; indeed, its witness, Secretary Raffensperger, contradicted the State's allegations and testified that Mr. Meadows "didn't express any objections as far as [he was] aware to how that audit was being conducted" and "didn't ask for anything to be done differently when he visited that audit." Tr. 218:9–16.

### Act 93 – President's Call to Frances Watson

Mr. Meadows considered arranging this call part of his role as Chief of Staff, Tr. 53:17–21, and did not participate in the call itself, Tr. 89:10–11. His conduct was consistent with the duties and responsibilities of that role, including arranging and staffing the President's calls and

---

"truly just in a fact-finding mode to observe what they were doing and felt like the Secretary of State's office was doing a good job on that."), 77:11–12 ("[M]y concern was that—that if there was an audit procedure being done, to reiterate with the President the veracity of that audit . . . ."), 77:22–24 ("[T]hat question did come up [with the President] and I was able to talk about how I felt like Ms. Watson and the GBI had done an outstanding job in Cobb County.").

[30] Tr. 81:9–15 (explaining that he was "trying to make sure that I kept the President well informed . . . . Broadly looking at his time and trying to make sure that, with all of the other things that were going on, checking off a box to say this has been checked, that's a question that's been asked and answered."), 96:20–97:2 ("And being able to take this particular question of signature verifications . . . off the table, would allow for one area to be closed. Be able to work towards, you know, a peaceful transition of power, continue to work on the other issues . . . [F]or me, it was being able to take an open question off the table.").

[31] Tr. 81:10–11 (explaining that it was important to "be able to inform [the President] of any potential for executive orders, future legislation"), 81:23–82:5 (describing "the potential federal interest, the potential for future legislation, for executive orders, . . . for other federal agencies to be aware. You know, it's not just the President. It would be—in terms of elections, it's [DHS], it's DOJ, it's others that all are concerned about a free and fair election. And so being able to advise him of that was—was critical. That's part of—part of my role.").

meetings,[32] and maintaining awareness of matters before the President.[33] The State presented no contrary evidence; the State did not call Ms. Watson, despite issuing a subpoena for her testimony, and introduced no evidence of the call itself.

### Act 96 – Text Regarding Signature Verification

Mr. Meadows did not text Ms. Watson, as charged in the Indictment, Tr. 54:8–10, though communicated something similar to Jordan Fuchs as part of a broader text message, Tr. 90:14–16. Contrary to the State's characterization, the message was not a "financial offer" but an inquiry about the ability "to speed things up," Tr. 91:25–92:2, based on a similar development in Wisconsin, Tr. 92:6–17. Mr. Meadows considered these communications part of his role of Chief of Staff, Tr. 54:3–4, and his conduct was consistent with the duties and responsibilities of that role, including gathering information on matters before the President,[34] advising the President,[35] and managing the President's time and ability to give attention to federal duties by closing

---

[32] *See generally* Tr. 16:8–15; *see also* Tr. 89:7–8 (acknowledging that he "arrange[d] a telephone call between Ms. Watson and then President Trump").

[33] Tr. 16:10–13 ("Part of my job was to . . . be aware of everything that was going on or try to be aware of everything, which ended up being a much more difficult task than I could ever, ever imagine"), 19:24–20:5 ("So a lot of times the meetings asked for were getting so I could give the President advice, either in private or in the meeting. . . . [R]eally it was about me trying to be aware."), 33:18–34:5 ("[Q] Why did you need to know what was going on, including politically? [A] One, to give advice to the President of the United States. To help prioritize his time. But the other is, is trying to skate to where the puck is. There were no rhyme or reason where questions might come up, . . . [a]nd so having—having a broad understanding of what was going on was . . . critically important as a senior advisor to the President so that I could anticipate what logistics were needed and what we needed to do.").

[34] Tr. 92:15–17 (explaining that the issue "came up" based on a recent White House meeting about a similar recount issue in Wisconsin).

[35] Tr. 92:23–93:2 ("I didn't speak for the campaign, didn't work for the campaign. But certainly being able to advise the President of the United States. You know, he was looking at ways to make sure that we could get a definitive yes or no quickly.").

13

out matters of ongoing concern to the President.[36] The State presented no contrary evidence and did not introduce the text message in question.

### Act 112 – January 2 Secretary Raffensperger Call

Mr. Meadows considered this part of his role as Chief of Staff, Tr. 51:4–11,[37] and his conduct was consistent with the duties and responsibilities of that role, including maintaining awareness of matters before the President,[38] setting up meetings between the President and state officials at the President's request,[39] managing the President's time by addressing matters taking the President's attention and impacting the ability to address matters of ongoing federal concern,[40] and addressing

---

[36] *See supra* n.30.
[37] *See also* Tr. 124:16–17 ("I was actually in my Chief of Staff's office by myself.").
[38] Tr. 129:16–19 ("What I'm saying is I kept getting asked about it in my official duties as Chief of Staff of the President of the United States. I kept getting asked about Fulton County and was there going to be a signature verification.").
[39] Tr. 110:16–18 ("Me setting up a phone call for the President of the United States at his direction was certainly something that I believe was in my duty as Chief of Staff to help facilitate.").
[40] Tr. 127:23–128:12 ("[F]or me it was all about trying to make sure that a number of these allegations . . . make sure we've got those issues dealt with. And . . . be able to finish up the things that we had in 60 days, have a peaceful transfer of power, make sure that we got all of that done. . . . And if I knew that [allegations] were not true, it was much easier for me to speak with authority with the President."), 123:21–133:1 ("At least we've got something here that hopefully we can agree upon . . . Let's get this particular issue off the table. Hopefully get the attorneys together where they can talk about it. And . . . use that as an opportunity to close out the call."), 149:24–150:5 ("I felt like that if we could get both groups together where the attorneys were talking to each other, that they would be able to look at the veracity of some of the claims . . . and make a determination as to whether they were valid or not valid and hopefully get this off of the President's concern list and as we look to continue on towards January 20th what ultimately would happen."), 151:2–8 ("[T]here were a number of issues that continued to get raised in the White House. Questions of whether allegations of fraud . . . . But I also had a timeline in terms of getting certain things done. And those, so long as they were open questions, would not allow us to continue with the transition.").

14

the federal interest in free and fair elections.[41] The State did not present contrary evidence; Secretary Raffensperger confirmed Mr. Meadows's limited role in the call (consistent with audio recording introduced into evidence), noting that Mr. Meadows "was acting on behalf of the President," Tr. 219:14; making clear that he did not believe Mr. Meadows's participation or statements on the call were "inappropriate," Tr. 220:16; and acknowledging that Mr. Meadows did not make any requests to change vote totals, Tr. 222:6–9, or make allegations of voter fraud, Tr. 220:5–7.[42]

Thus, based on the Notice of Removal and the record before the Court, each one of these charged acts has a sufficient connection to Mr. Meadow's official duties to support removal. But based on the black-letter law outlined above, the Court need not reach that conclusion to permit removal. If the Court finds that any charged conduct relates to Mr. Meadow's official duties, that is the end of the inquiry; removal must be permitted.

\* \* \* \* \*

The Court should promptly permit removal and so notify the state court.

---

[41] Tr. 110:2–6 ("[C]ertainly in a broad sense, [I was] trying to make sure that we had accurate, fair elections, . . . whether that's . . . an Article I, II, and III responsibility, we all want an accurate election.").

[42] State witness Kurt Hilbert testified that he "never met Mr. Meadows," Tr. 163:5; that he did not consult with Mr. Meadows about Trump campaign litigation, Tr. 179:17–20; that he never spoke to Mr. Meadows after the January 2 call, Tr. 181:13; and that he understood that Mr. Meadows participated on the call because he was Chief of Staff, Tr. 184:22–25.

Dated: August 31, 2023

Joseph M. Englert
MCGUIREWOODS LLP
1230 Peachtree St., N.E., Suite 2100
Atlanta, GA 30309
(404) 443-5500
Jenglert@mcguirewoods.com

Respectfully submitted,

*/s/ George J. Terwilliger III*

George J. Terwilliger, III*
John S. Moran*
Michael Francisco*
Robert J. Bittman*
Emily Erb Kelley*
Francis J. Aul*
MCGUIREWOODS LLP
888 16th Street NW, Suite 500
Washington, DC 20006
(202) 857-1700
gterwilliger@mcguirewoods.com
jmoran@mcguirewoods.com
mfrancisco@mcguirewoods.com
rbittman@mcguirewoods.com
ekelley@mcguirewoods.com
faul@mcguirewoods.com
* Admitted *Pro Hac Vice*

*Counsel to Mark R. Meadows*

## CERTIFICATE OF SERVICE

On August 31, 2023, the foregoing ***Supplemental Brief of Defendant Mark R. Meadows in Support of His Notice of Removal*** was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

This, the 31st day of August, 2023.


 /s/ John S. Moran

John S. Moran*
MCGUIREWOODS LLP
888 16th Street NW, Suite 500
Washington, DC 20006
(202) 857-1700
jmoran@mcguirewoods.com
* Admitted *Pro Hac Vice*

## **CERTIFICATE OF COMPLIANCE**

The undersigned certifies that 14-point Times New Roman font was used for this document and that it has been formatted in compliance with Local Rule 5.1.

This, the 31st day of August, 2023.

/s/ John S. Moran

John S. Moran*
MCGUIREWOODS LLP
888 16th Street NW, Suite 500
Washington, DC 20006
(202) 857-1700
jmoran@mcguirewoods.com
* Admitted *Pro Hac Vice*