**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **THE STATE OF GEORGIA** | **CIVIL ACTION FILE** |
| **v.** | **No. 1:23-CV-03621-SCJ** |
| **MARK R. MEADOWS,** | **RE: NOTICE OF REMOVAL OF** |
| **Defendant.** | **FULTON COUNTY SUPERIOR COURT INDICTMENT NO. 23SC188947** |

**ORDER**

This matter appears before the Court following Defendant Mark R. Meadows's filing of a Notice of Removal. Doc. No. [1]. [1] This Order addresses a relatively narrow question: Has Meadows carried his burden of demonstrating that removal of the State of Georgia's criminal prosecution against him is proper under the federal officer removal statute, 28 U.S.C. § 1442(a)? Having considered the arguments and evidence, the Court concludes that Meadows has not met his burden. Therefore, the Court **DECLINES** to assume jurisdiction over the State's

_____

[1] All citations are to the electronic docket unless otherwise noted, and all page numbers are those imprinted by the Court's docketing software.

criminal prosecution of Meadows under 28 U.S.C. § 1455 and **REMANDS** the case to Fulton County Superior Court. [2]

Because the Court lacks jurisdiction over this matter, the Court **DIRECTS** the Clerk to **TERMINATE** all pending motions and **CLOSE** this case.

## I.    BACKGROUND

Meadows served as the White House Chief of Staff.[3] Defendant's Exhibit ("DX") 1. His tenure began on March 31, 2020 and ended on January 20, 2021, when President Biden assumed the Office of President of the United States. Id.; Doc. No. [65] ("Hearing Tr.") Tr. 9:22–10:3.

On August 14, 2023, a Fulton County, Georgia Grand Jury returned an indictment charging 19 Defendants with various crimes related to alleged post-election interference with the 2020 presidential election in Georgia ("the

---

[2] Despite using the term "remand" the Court has not actually assumed jurisdiction over this case under Section 1455, and the State proceedings are ongoing. Nevertheless, Section 1455 itself conceives of some form of remand, 28 U.S.C. § 1455(b)(4), and other federal courts who have failed to find that federal jurisdiction exists over a criminal prosecution have "remanded" the prosecution to the state court. See, e.g., New York v. Trump, ---F. Supp. 3d----, No. 23 CIV. 3773 (AKH), 2023 WL 4614689, at *1 (S.D.N.Y. July 19, 2023).

[3] Meadows's commission lists his official title as Assistant to the President and Chief of Staff. See DX 1. For consistency in this Order, the Court will use the term "White House Chief of Staff" to encompass Meadows's full title of "Assistant to the President and Chief of Staff."

Indictment"). Doc. No. [1-1]. The Indictment charged all Defendants with conspiracy under the Georgia Racketeer Influenced and Corrupt Organizations ("RICO") Act, O.C.G.A. § 16-14-4(c). Doc. No. [1-1], 13 (Count 1). It also charged different co-Defendants with other various criminal violations. See generally Doc. No. [1-1], 72–97 (Counts 2–41).

The Indictment charges Meadows specifically with the RICO conspiracy, O.C.G.A. § 16-14-4(c), and solicitation of violation of oath by a public officer, O.C.G.A. §§ 16-14-7 & 16-10-1. Doc. No. [1-1], 13 (Count 1), 87 (Count 28). Meadows argues that the charges against him relate to the scope of his official duties and that he has colorable federal defenses. See, generally Doc. No. [1]. Based on those arguments, on August 15, 2023, Meadows filed his Notice of Removal of the criminal prosecution in this Court. Id.

Relying on 28 U.S.C. § 1455, Meadows asserts federal officer jurisdiction under 28 U.S.C. § 1442. See, generally id. The Court declined to summarily remand Meadows's removal action and ordered an evidentiary hearing be held on the Notice of Removal on August 28, 2023, pursuant to Section 1455(b)(5). Doc. No. [6]. The Court also ordered the State to respond to Meadows's Notice of Removal (id.), which it did on August 23, 2023 (Doc. No. [27]). Meadows replied

on August 25, 2023. Doc. No. [45]. The same day, the Court permitted amicus curiae to file a brief in support of declining jurisdiction. Doc. Nos. [54]; [55].

Before the hearing, Meadows filed a Motion to Dismiss (Doc. No. [15]) and an Emergency Motion to enjoin his arrest in Fulton County, Georgia (Doc. No. [17]). The Motion to Dismiss remains outstanding on the Court's Docket. The Court denied Meadows's Emergency Motion under 28 U.S.C. § 1455(b)(3), which expressly mandates that the state court criminal proceeding continues until the federal court notifies the state court that it has assumed federal jurisdiction over the prosecution. Doc. No. [25].

On August 28, 2023, the Court held a hearing on Meadows's Notice of Removal. Doc. No. [62]. Meadows personally testified[4] and, through counsel, admitted a number of exhibits, including two declarations of persons who

_____

[4] At a criminal trial, the State has the burden of proof. Thus, at a criminal defendant's trial on the merits, he never has the obligation of presenting a defense or testifying, and those choices can never be held against him. U.S. Const. amend. V. For a notice of removal, however, the Defendant has the burden of establishing subject matter jurisdiction. 28 U.S.C. § 1455(b)(5); See Leonard v. Enter. Rent a Car, 279 F.3d 967, 972 (11th Cir. 2002) ("A removing defendant bears the burden of proving proper federal jurisdiction."); cf. also Maryland v. Soper, 270 U.S. 9, 34 (1926) (discussing defendant's testifying in support of their notice of removal of a criminal indictment) (collecting cases).

worked in the White House at the time he was the White House Chief of Staff and were familiar with his role in the administration as Chief of Staff. The State called Kurt Hilbert, an attorney who represented President Trump and the Trump campaign in 2020, and Georgia Secretary of State, Brad Raffensperger. The State also admitted a number of exhibits, including an audio recording of the January 2, 2021 phone call between President Trump, Secretary Raffensperger, and others, in which Meadows participated. State's Exhibit ("SX") 3.

At the conclusion of the hearing, the Court took the matter of its jurisdiction over the criminal prosecution under advisement. The Court subsequently ordered post-hearing briefing regarding the role of the Indictment's alleged overt acts for purposes of determining applicability of the federal officer removal statute. Doc. No. [63]. The Parties timely submitted the requested briefing. Doc. Nos. [66]; [67]. Having considered the arguments put forth by the Parties, the evidence submitted at the evidentiary hearing, and the briefing on this matter, the Court now enters this Order concluding that the Court lacks federal jurisdiction over Meadows's criminal prosecution.

## II.    LEGAL STANDARD

"[A] federal district court should be slow to act 'where its powers are invoked to interfere by injunction with threatened criminal prosecutions in a state court.'" <u>Cameron v. Johnson</u>, 390 U.S. 611, 618 (1968) (quoting <u>Douglas v. City of Jeannette</u>, 319 U.S. 157, 162 (1943)). There is a "strong judicial policy against federal interference with state criminal proceedings." <u>Arizona v. Manypenny</u>, 451 U.S. 232, 243 (1981) (quoting <u>Huffman v. Pursue, Ltd.</u>, 420 U.S. 592, 600 (1975)).

An exception to those general concepts of federalism is the federal officer removal statute, 28 U.S.C. § 1442(a)(1). That statute, allows for federal jurisdiction over "a criminal prosecution . . . against . . . any officer (or any person acting under that officer) of the United States . . . for or relating to any act under color of such office." Federal officer removal "is an incident of federal supremacy and is designed to provide federal officials with a federal forum in which to raise defenses arising from their official duties." <u>Florida v. Cohen</u>, 887 F.2d 1451, 1453 (11th Cir. 1989) (citing <u>Willingham v. Morgan</u>, 395 U.S. 402, 405 (1969)). However, because of a preference for state courts conducting their state prosecutions, removal of a state criminal prosecution requires a "more detailed showing" of

6

the relation between the acts charged and the federal role at issue. <u>Willingham v.</u> <u>Morgan</u>, 395 U.S. 402, 409 n.4 (1969). Furthermore, federal courts must maintain a balance between what Section 1442 allows and respect for a State's right to deal with matters properly within its domain.

Meadows removed this criminal prosecution under 28 U.S.C. § 1455, which provides the procedure for removing a state criminal prosecution to a federal district court. "28 U.S.C. § 1455 'merely provides procedures that must be followed in order to remove a criminal case from state court when a defendant has the right to do so under another provision.'" <u>Maine v. Counts</u>, No. 22-1841, 2023 WL 3167442, at *1 (1st Cir. Feb. 16, 2023) (quoting <u>Kruebbe v. Beevers</u>, 692 F. App'x 173, 176 (5th Cir. 2017) (per curiam)). Upon filing a notice of removal, the Court must promptly determine whether the notice and its attachments clearly fail to establish the Court's subject matter jurisdiction, and if they do, the case is summarily remanded to state court. 28 U.S.C. § 1455(b)(4). If summary remand is not granted, then the district court must "promptly" hold an evidentiary hearing to determine the "disposition of the prosecution as justice shall require." <u>Id.</u> § 1455(b)(5). Based on the facts adduced at the hearing and the arguments put forth by the Parties, the Court must determine whether the

7

Defendant has met his burden in establishing that the Court has subject matter jurisdiction over his criminal prosecution. Trump, 2023 WL 4614689, at * 5 (citing United Food & Comm. Workers Union v. CenterMark Props. Meriden Square, Inc., 30 F.3d 298, 301 (2d Cir. 1994)).

Under 28 U.S.C. § 1442, the question of the scope of a federal officer's authority contains issues of law and fact. See Nadler v. Mann, 951 F.2d 301, 305 (11th Cir. 1992) ("[D]etermination[s] of whether an employee's actions are within the scope of his employment involve[ ] a question of law and fact.").

Ultimately, for removal under Section 1455 to be proper, the removing party must show that there is a basis for the federal court to exercise jurisdiction over the criminal prosecution. See Leonard, 972 F.3d at 972  ("A removing defendant bears the burden of proving proper federal jurisdiction."). If the Court lacks federal jurisdiction, then the case cannot proceed in this forum.

The Supreme Court has cautioned that "an airtight case on the merits in order to show the required causal connection" is not required and that courts are to "credit" the movant's "theory of the case" for the elements of the jurisdictional

inquiry.[5] <u>Jefferson Cnty. v. Acker</u>, 527 U.S. 423, 432 (1999). "The point is only that the officer should have to identify as the gravamen of the suit an act that was, if not required by, at least closely connected with, the performance of his official duties." <u>Id.</u> at 447 (Scalia, J., dissenting).

## III.   ANALYSIS

To determine whether Meadows is able to remove based on federal officer jurisdiction pursuant to 28 U.S.C. § 1442(a)(1), the Court must answer the following questions: (1) whether Meadows was a federal officer during the time of the allegations in the Indictment, (2) whether the charged conduct in the criminal prosecution were undertaken for or related to Meadows color of office,[6] and (3) whether Meadows has put forth a colorable federal defense for the

---

[5] The Court notes that this language in <u>Acker</u> refers to the colorable defense prong of the analysis. 527 U.S. at 432. It is unclear whether the theory of the case language applies to the second prong of the analysis. Nevertheless, the Court will evaluate the theory of the case as it relates to the color of office because at least one district court recently has applied it in this manner. <u>See</u> <u>Georgia v. Heinze</u>, 637 F. Supp. 3d 1316, 1322 (N.D. Ga. 2022).

[6] Acts taken under color of office, must be either "vested with, or appear to be vested with, the authority entrusted to that office." <u>Color of Office</u>, <u>Black's Law Dictionary</u> (11th ed. 2019).

criminal prosecution. <u>Caver v. Cent. Ala. Elec. Coop.</u>, 845 F.3d 1138, 1142 (11th Cir. 2017).

The State concedes that at the time of the events alleged in the Indictment, Meadows was a federal officer and his role was the White House Chief of Staff. Hearing Tr. 251:12–17. Thus, the Court must next evaluate the second question of whether the acts in the Indictment relate to his role as White House Chief of Staff.

To determine whether the charged conduct was undertaken for, or related to Meadows's color of office, the Court must: (A) define the act(s) allegedly undertaken by Meadows in the Indictment, (B) ascertain the scope of the federal officer role of the White House Chief of Staff, and (C) analyze whether Meadows showed that the act(s) in the Indictment were for or related to the role of the White House Chief of Staff.

### A.   The Federal Officer Removal Statute

The Court must define what constitutes an "act" under 28 U.S.C. § 1442(a)(1). Then, the Court must assess how the "act" functions under the RICO

10

statute. Finally, the Court will establish the contours of the act as they relate to Meadows in the Indictment.[7]

### 1.   Section 1442: The Text and Precedent

The pertinent portion of § 1442(a)(1) provides: "[a] . . . criminal prosecution that is commenced in a State court and that is against or directed to . . . any officer . . . of the United States . . . in an official or individual capacity, for or relating to any act under color of such office" "may be removed by them to the district court of the United States." The phrase "for or relating to any act under color of such office" modifies the earlier clause, "[a] criminal prosecution . . . that is directed against or directed to an officer" of the United States. 28 U.S.C. § 1442(a)(1). This structure indicates that the criminal prosecution must arise from an act that is for or relating to the color of a federal office. Even if a criminal defendant can characterize individual instances of behavior as part of his official duties within the broader charged conduct, this is not enough to convey subject matter jurisdiction on this Court. Put differently,

---

[7] This Court primarily focuses on the Indictment's RICO charge because the other charge against Meadows, soliciting a violation of an oath by a public official, is also alleged as an overt act (with evidence submitted) in support of the RICO charge. Compare Doc. No. [1-1], 50 (Overt Act 112), with id. at 87 (Count 28).

facts indicating that a criminal defendant at times operated under the scope of his federal office will not provide this Court with subject matter jurisdiction under Section 1442 unless the State is criminally prosecuting the officer for those specific acts.

This interpretation is consistent with other courts' analyses. Specifically, courts have looked at whether the "claims" or the "charges" related to acts taken within the scope of the federal office. [8] In <u>Nadler</u>, the Eleventh Circuit suggested that the district court had subject matter jurisdiction where "one *claim* is cognizable under Section 1442 . . . ." 951 F.2d at 306 n.9 (emphasis added) (quoting <u>National Audubon Soc. v. Dep't of Water & Power</u>, 496 F. Supp. 499, 509 (E.D. Cal. 1980)). Therefore, the Court looks at (1) what the charges are against the federal officer, and (2) whether the charged conduct is for or relates to the color of the federal office.

The cases cited by Meadows support the proposition that courts look to the whole "claim" alleged, not just isolated facts supporting the claim, to determine

---

[8] "Claims" in civil actions correspond to "charges" in criminal prosecutions. <u>Cf.</u> <u>Kellogg Brown & Root Srvs. v. United States</u>, 575 U.S. 650, 653 (2015) ("[W]e must decide . . . whether the Wartime Suspension of Limitations Act applies only to criminal *charges* or also to civil *claims*." (emphasis added)).

whether Section 1442 has been satisfied. Doc. No. [67], 2 nn.1–3; see also Heinze, 637 F. Supp. 3d at 1323 ("[A] federal officer can remove a criminal proceeding commenced in a State court where the criminal *charges* involve actions taken 'in an official or individual capacity . . . .'" (quoting 28 U.S.C. § 1442(a)(1) (emphasis added)); Ladies Mem'l Ass'n Inc. v. City of Pensacola, No. 3:20CV5681/MCR/ZCB, 2023 WL 2561785, at *3 (N.D. Fla. Mar. 17, 2023) ("If the complaint contains 'even one federal *claim*[,]' then the defendant has 'the right to remove the entire case.'" (alteration in original) (emphasis added) (quoting Convent Corp. v. City of N. Little Rock, 784 F.3d 479, 483 (8th Cir. 2015))); Sawyer v. Foster Wheeler LLC, 860 F.3d 249, 257 (4th Cir. 2017) (finding removal where an officer asserts a federal defense to even one *claim*). Thus, the Court looks at the criminal charge to determine whether the charge relates to the scope of Meadows's federal office.

"To satisfy the [scope of federal office] requirement, the officer must show a nexus, 'a causal connection, between the charged conduct and asserted official authority." Acker, 527 U.S. at 431 (quoting Willingham, 395 U.S. at 409). The Supreme Court has articulated the following test for the "under color of office" requirement:

13

> There must be a causal connection between what the
> officer has done under asserted official authority and the
> state prosecution. It must appear that the prosecution of
> him, for whatever offense, has arisen out of the acts done
> by him under color of federal authority and in
> enforcement of federal law, and he must by direct
> averment exclude the possibility that it was based on acts
> or conduct of his not justified by his federal duty.

Mesa v. California, 489 U.S. 121, 131–32 (1989) (quoting Soper, 270 U.S. at 32).

Under Eleventh Circuit jurisprudence, a key factor in determining applicability

of the federal officer removal statute "is whether there is a causal connection

between [the State's charges] and an act of Defendant [] that forms the basis of

those claims." Caver, 845 F.3d at 1144.

The Court notes that the RICO charge against Meadows presents a novel

question in this case. Most cases invoking federal officer removal involve claims

based on discrete actions taken by a defendant. For example, in Heinze, the

defendants were charged with the discrete acts of felony murder, aggravated

assault with a deadly weapon, burglary, false statements, and violation of oath

by a public officer." 637 F. Supp. 3d at 1318, nn.1–2. A RICO conspiracy,

alternatively, involves wide-ranging allegations of licit and illicit activities,

undertaken by an association of individuals, and in furtherance of a criminal

enterprise. See Section (III)(A)(1) infra. The State's prosecution in this case is

14

illustrative: the conspiracy charged here is alleged to have occurred over many months, included at least 19 individuals, and encompassed 161 overt acts. Doc. No. [1-1].

Although RICO conspiracies are rarely removed under Section 1442, the Court is not without some precedent to guide the analysis. In 1982, the Eleventh Circuit evaluated whether an FBI agent, as a federal officer, had a federal immunity defense under the Supremacy Clause against a Georgia RICO charge. Baucom v. Martin, 677 F.2d 1346, 1347–48 (11th Cir. 1982).[9] The Eleventh Circuit affirmed the district court, who found that the sole overt act alleged against the FBI agent related to bribing a state court judge. Id. at 1348–51. The district court found, and the Eleventh Circuit affirmed, the conduct charged against the FBI agent was taken within the scope of the agent's federal office because the bribery occurred during the execution of a state and federal criminal investigation into judicial corruption. Id.

---

[9] Baucom was not a removal case. Rather, it was a federal suit filed by the officer to preemptively prevent the commencement of a state criminal prosecution. Baucom, 677 F.2d 1346.

On the other hand, the Fourth Circuit Court of Appeals held that the district court did not err in declining to exercise jurisdiction under Section 1442 where "the heart of [the plaintiff]'s claims" did not relate to the scope of federal duty. Mayor & City Council of Balt. v. BP P.L.C., 31 F.4th 178, 234 (4th Cir. 2022). In that case, the civil complaint alleged that the defendants, as agents of the United States, contributed "to climate change by producing, promoting, selling, and concealing the dangers of fossil[-]fuel products." Id. at 233 (alteration in original). The Fourth Circuit affirmed the district court's finding that defendants did not show a basis for federal officer removal by looking at the complaint as a whole. The Fourth Circuit determined that while some activities were arguably within the scope the federal office (i.e., the production and concealment of hazardous fossil fuels was controlled or directed by a federal officer), the "lack of federal control over the production and sale of *all* fossil-fuel products is relevant to the nexus analysis." Id. at 234. Moreover, even if production and sales were controlled or directed by a federal officer, the "heart" of the claims asserted was concealment and misrepresentation—which did not remove to the defendant's official duties. Id. Ultimately, the Fourth Circuit concluded that the activities relating to the official duties (i.e., production and sales) were "too

16

tenuous" to the allegations of concealment and misrepresentation "to support removal under § 1442." Id. at 234.

Thus, under the text of the statute, binding authority, and persuasive authority, the Court finds that "act" in the federal officer removal statute is best defined as the "heart" of the criminal charge. BP PLC, 31 F.4th at 234. With this in mind, the Court now turns to the charges at issue in this case.

### 2. *The Georgia RICO Charge*

The Indictment charges Meadows and his 18 Co-Defendants with engaging in a RICO conspiracy to violate RICO statute. RICO statute provides that it is unlawful "to conspire or endeavor to ['conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity'.]" O.C.G.A. § 16-14-4(c) (quoting id. § 16-14-4(b)). An "enterprise" is defined as "any person . . . or association, or group of individuals associated in fact although not a legal entity[.]" Id. § 16-14-3(3). The enterprise itself need not be illicit. Id For purposes of this case, a "[p]attern of racketeering activity" requires at least two acts of racketeering activity with "same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents[.]" Id. § 16-14-3(4).

17

"Racketeering activity" includes the commission (or attempted commission or solicitation, coercion, or intimidation of another to commit) of a variety of Georgia criminal statutes. See id. § 16-14-3(5)(A). It also can include violations of certain types of state or federal laws outside the State of Georgia. Id. § 16-14-3(5)(B)–(C).

The RICO *conspiracy* charge only requires, at the least, that one co-conspirator commit an "overt act to effect the object of the conspiracy[.]" Id. § 16-14-4(c)(1). While not specifically defined in the RICO statute, the Georgia Supreme Court has indicated that an overt act under the general conspiracy provision, O.C.G.A. § 16-14-8, means "a specific type of open or manifest act made in furtherance of a conspiracy to commit a crime." Bradford v. State, 285 Ga. 1, 4, 673 S.E.2d 201, 204 (2009). Critically, for conspiracy crimes, "the indictment [need not] set forth the particulars of the overt act." State v. Pittman, 302 Ga. App. 531, 535, 690 S.E.2d 661, 664 (2010) (quoting Bradford v. State, 283 Ga. App. 75, 78, 640 S.E.2d 630, 633 (2006), rev'd on other grounds Bradford, 285 Ga. at 1, 673 S.E. at 203). Indeed, "the government is not required to prove the overt act specified in the indictment." Nordahl v. State, 306 Ga. 15, 26, 829 S.E. 2d 99, 109 (2019). Nor, must the State ultimately prove that each co-conspirator

18

defendant committed an overt act, so long as one co-conspirator committed overt acts in furtherance of the conspiracy. <u>Cf</u>. <u>Thomas v. State</u>, 215 Ga. App. 522, 523, 451 S.E.2d 516, 517 (1994).

In sum, to establish a RICO conspiracy the State only need prove that any co-conspirator committed one overt act in furtherance of the conspiracy, whether the overt act was specifically charged in the Indictment or not. In other words, the State can prove its RICO charge against Meadows by showing any one of his co-Defendants committed *any* overt act in furtherance of the conspiracy—whether that overt act is in the Indictment or not.

The overt acts alleged against Meadows specifically "includ[e] but are not limited to" (Doc. No. [1-1], 20): attending a meeting with President Trump and Michigan officials about election fraud in Michigan (<u>id</u>. at 21 (Overt Act 5)), messaging a United States Representative from Pennsylvania (<u>id</u>. at 21 (Overt Act 6)), meeting with Pennsylvania legislators about an election-related special session (<u>id</u>. at 22 (Overt Act 9)), requesting a memo regarding "disrupting and delaying the joint session of Congress on January 6, 2021" when electors' votes were to be counted (<u>id</u>. at 24 (Overt Act 19)), physically attending and observing a nonpublic Georgia election audit and recount (<u>id</u>. at 44 (Overt Act 92)),

arranging a phone call between President Trump and the Georgia Secretary of State's Chief Investigator regarding the Georgia presidential election results (id. (Overt Act 93)), messaging the Chief Investigator about the potential for a quicker signature verification of the Fulton County election results if "the [T]rump campaign assist[ed] financially" (id. at 45 (Overt Act 96)), and soliciting Georgia Secretary of State Brad Raffensperger to violate his oath of office by altering the certified returns for presidential electors (id. at 50 (Overt Act 112); see also id. at 87 (Count 28 against Meadows under O.C.G.A. §§ 16-14-7 & 16-10-1)).

While the Indictment's named overt acts are not elements of the RICO conspiracy charged, the Court still finds that they are relevant evidence of whether Meadows's association with the enterprise related to his role as White House Chief of Staff. See Section (III)(C)(2) infra.

To clarify, under Georgia RICO, the overt acts are not elements of the RICO charge. They are used to illustrate the existence of the conspiracy and the various alleged co-conspirators' association with the conspiracy. Georgia law makes clear that the State need not prove the existence of any particular overt act to prove its RICO claim, nor must the State prove any of the overt acts that are currently alleged in the Indictment. Because the "act" as defined by Section 1442(a)(1)

means the charge against Meadows—under Georgia's RICO statute—his criminal prosecution is removable when his association with the conspiracy relates to the color of his federal office.

### 3.   *The Alleged Act Taken for Purposes of Federal Officer Removal*

Federal officer removal is appropriate when the gravamen, or "heart" of the charge relates to the federal office. BP P.L.C., 31 F.4th at 234. As stated above, the Court determines that the actual "act" alleged against Meadows is the RICO charge, not the overt acts. Section 1442 requires the Court to determine if Meadows was acting within the scope of his federal office in the alleged act of associating with a conspiracy to violate various Georgia criminal statutes. Put differently, the act at issue for purposes of the Indictment's RICO charge is Meadows's alleged *association* with the conspiracy. The overt acts, however, "by and large . . . only serve to tell a broader story about" the conspiracy to "unlawfully change the outcome of [the 2020 presidential] election in favor of [President] Trump" but they are "not the source of [criminal] liability." Id. at 233; Doc. No. [1-1], 14.

The Court acknowledges that, even though it was not required, the State chose to include these overt acts in the Indictment. Unsurprisingly, Meadows

21

structured his evidentiary presentation to the Court and his briefing around the eight overt acts in which he is mentioned. Following the hearing, the Court itself ordered supplemental briefing on the issue of whether a finding that some, but not all overt act(s) involving Meadows acting under color of federal office was enough to trigger the removal statute. Doc. No. [63]. And to be sure, defining Meadows's "act" as associating with the alleged RICO conspiracy does not preclude assessing the overt acts alleged. See Baucom, 677 F.2d at 1346 (evaluating the overt acts alleged against the FBI agent to determine whether his involvement in the conspiracy was for his federal duties). Accordingly, the Court's subsequent discussion of the "relating to" requirement for federal officer removal includes an analysis of the overt acts in order to determine whether Meadows's association with the alleged conspiracy (the conduct for which he was charged) related to the scope of his federal duties.

Because the inquiry hinges on whether Meadows's association with the conspiracy related to the color of his office, however, jurisdiction is not conferred simply because a single overt act relates to Meadows's federal office. After all, the Indictment alleges a series of associative acts spanning over a year, and the overt acts attributed to Meadows span three months. Doc. No. [1-1], 15–71.

Undoubtedly, during that time Meadows performed actions for or that related to the color of his office. But the relevant inquiry is what activities go the *heart* of Meadows's participation in the enterprise and whether those activities relate to the scope of his federal office. If they do not, then Meadows cannot satisfy his burden of establishing subject matter jurisdiction under the federal officer removal statute.

### B.    Meadows's Role as a Federal Officer

Having defined the "act" at issue for federal officer removal, the Court now turns to Meadows's federal office and its scope. This inquiry is necessary because the authority of Meadows's office will dictate the scope of the duties associated with that role. At the evidentiary hearing, Meadows testified broadly to the scope of his role as White House Chief of Staff; he also offered two declarations to further describe the Chief of Staff's role. Hearing Tr. 9:8 (commencing Meadows's testimony), 156:19–158:24 (admitting the two declarations as DX 3 and 4).[10] Meadows also testified about his role specifically in reference to the Indictment's overt acts.

─────────────────────

[10]  The Court admitted these declarations over the State's objection and indicated that it would assess the weight to be given the declarations given they are unsworn and

### 1.       The White House Chief of Staff Role

Meadows was the White House Chief of Staff and Assistant to President Trump from March 30, 2020 until January 20, 2021. DX 1; Hearing Tr. 9:25–10:3. His official title was "[A]ssistant to the President and Chief of Staff." Id. at 13:8–10; DX 1. He described himself as "the senior official in charge of the Executive Office of the President." Hearing Tr. 14:3–5; see also DX 3 ¶ 3 (indicating Meadows had "broad responsibilities" including "advising and assisting the President and managing the staff of the White House Office within the Executive Office of the President"); DX 4 ¶ 4 (asserting that Meadows "[was] responsible for keeping the trains running on time for the White House [and] the Executive Branch of the federal government"). Meadows described his position to require "oversee[ing] all the federal operations," which extended to actions taken inside of and outside of the West Wing. Hearing Tr. 13:10–12.

Specifically, Meadows testified that he was part of "almost every meeting" with the President, either as a "principal" or as an "observer." Id. at 16:8–10; DX

---

unnotarized. Hearing Tr. 158:23–24. In this Order, the Court considers these declarations but affords their contents most weight when corroborated by other testimony or evidence.

4 ¶ 6 ("Meadows's general practice was to attend many but not all the meetings between the President and other parties, regardless of subject matter."). In meetings, "principals" may "have a particular position" regarding a "particular issue" and would "try to show the pros and cons of [the] arguments so that some resolution could be made." Hearing Tr. 19:1–8. Even as an "observer," he attended the President's meetings because his job required him to "try to be aware of everything [in the meeting] . . . even if [he] was not a principal[.]" Hearing Tr. 16:10–15; DX 4 ¶ 5 ("Meadows was responsible for administering the planning and scheduling of the President's meetings, telephone conferences, and other engagements, regardless of subject matter."). These meetings might include "members of Congress, other executive branch officials[, and] state or local government officials." Hearing Tr. 21:12–20; see also DX 3 ¶ 5 (indicating the Chief of Staff was "responsible for managing the President's calendar, arranging meetings, calls, and other discussions with federal, state, and local officials, as well as private citizens").

Meadows testified that as Chief of Staff he had to "be aware of the President's schedule." Hearing Tr. 19:16. This meant he would "move meetings along . . . do the wrap-up . . . and bring things to a close where there was an

action item[.]" Id. at 19:16–22. If other executive branch staff were in the meeting to ensure it efficiently ended, then Meadows's involvement might be limited to a "quick pop in" on the meeting. Id. at 20:19–25.

Meadows asserts that another function of Meadows's role as White House Chief of Staff was "to be generally aware of what's going on" because he often was called upon to give the President advice. Id. at 19:23–20:7, 45:8–11. It also helped Meadows "prioritize [the President's] time" and "skate to where the p[uck] is" on certain issues. Id. at 33:20–24.

Meadows also testified that as White House Chief of Staff he was bound by the Hatch Act[11] and he could not engage in political activity. Hearing Tr. 39:7–25; 135:21–136:5. As discussed more fully below, the Hatch Act prohibits "an employee" from "us[ing] his official authority or influence for the purpose of affecting the result of an election." 5 U.S.C. § 2732(a)(1). This includes, "[u]sing his or her official title while participating in political activity." 5 C.F.R. § 734.302(b)(2). And political activity is defined as, "activity directed toward the

---

[11] To be clear, no Hatch Act violation has been charged against Meadows. And the Court is not determining if Meadows violated the Act, or if there is any merit to a potential Hatch Act claim.

success or failure of a political party, candidate for partisan political office, or partisan political group." Id. § 734.101.

The Court finds that the color of the Office of the White House Chief of Staff did not include working with or working for the Trump campaign, except for simply coordinating the President's schedule, traveling with the President to his campaign events, and redirecting communications to the campaign. Thus, consistent with his testimony and the federal statutes and regulations, engaging in political activities is exceeds the outer limits of the Office of the White House Chief of Staff.

### 2. *Meadows's Testimony and Theory of the Case*

Meadows's theory of the case is that he is entitled to immunity because the Indictment relates to his role as White House Chief of Staff. Doc. No. [1]. As part of his direct and cross examination testimony, Meadows addressed how the overt acts related to his specific federal role as the White Chief of Staff. Ultimately, Meadows concluded that, based on the topics and circumstances discussed in his testimony, he had not done anything outside the scope of his role as the White House Chief of Staff. Hearing Tr. 111:18–19. However, he did admit that there

could be activities the President requested which would be outside of the scope of the role a. Id. at 112:15–113:11.

While the Court credits Meadows's testimony about his role as White House Chief of Staff, it will give greater weight to the testimony of specific tasks that he outlined as within the scope of his office (i.e., time management, attending meetings, briefing the President, etc.). Meadows testified consistently about these duties on both direct and cross-examinations. Additionally, these duties are corroborated by the Declarations filed in support of Meadows's Notice of Removal (DXs 3, 4). However, the Court gives less weight to his assertions that all actions he took were within the scope of his office. When questioned about the scope of his authority, Meadows was unable to explain the limits of his authority, other than his inability to stump for the President or work onbehalf of the campaign. Hearing Tr. 111:12–113:6. The Court finds that Meadows did not adequately convey the outer limits of his authority, and thus, the Court gives that testimony less weight.[12]

_____

[12] In this case, Meadows was the main witness presenting testimony for his case. Thus, the Court must determine the appropriate amount of weight to assign to his testimony when evaluating it, the same as it does any other witness in an evidentiary hearing. However, given the nature of the motion, and the pending criminal proceedings the

**C.      RICO: Meadows Was Not Acting Under Color of Office**

The Court now turns to whether the acts alleged against and taken by Meadows are related to the color of his office as White House Chief of Staff. It ultimately concludes that the relevant acts are outside the scope of Meadows's federal office.

### 1.    *Federal and Statutory Limitations Regarding the Scope of the Office of White House Chief of Staff*

#### a)     Constitutional requirements

The Constitution does not provide any basis for executive branch involvement with State election and post-election procedures. The Elections Clause expressly reserves the "Times, Places, and Manner" of elections to state legislatures. U.S. Const. art. I, § 4, cl. 1; see also Shelby Cnty. v. Holder 570 U.S. 529, 543 (2013) ("[T]he Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections." (quoting Gregory v. Ashcroft, 501 U.S. 452, 461–62 (1991)); U.S. Term

_____

Court makes these decisions with great caution. The determinations here do not go to Meadows's propensity to be truthful as a general matter. However, the Court cannot undertake the task assigned by 28 U.S.C. § 1455(b)(5) without assigning the appropriate weight to the testimony.

Limits, Inc. v. Thornton, 514 U.S. 779, 833–34 (1995) ("[T]he Framers understood the Elections Clause as a grant of authority [to state legislatures] to issue procedural regulations, and not as a source of power to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints."). States have been tasked under the Elections Clause to "provide a complete code" for elections which ought to include "regulations 'relat[ing] to . . . prevention of fraud and corrupt practices [and] counting of votes . . . .'" Moore v. Harper, 600 U.S. ----, 143 S. Ct. 2065, 2085 (2023) (quoting Smiley v. Holm, 285 U.S. 355, 366 (1932)). This is not a power incident to a State's police powers but "derives from an express grant in the Constitution." Fish v. Kobach, 840 F.3d 710, 727 (10th Cir. 2016).

Courts have previously faced tough questions in cases involving Congress's power to use its lawmaking authority to oversee or empower the States in their duties under the Elections Clause. Cf. e.g., id. at 725–26 ("The Supreme Court has recently and repeatedly reaffirmed that 'the power the Elections Clause confers is none other than the power to pre-empt[ ]' . . . 'The Clause is a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to

preempt state legislative choices.'" (quoting <u>Arizona v. Inter Tribal Council of Ariz., Inc.</u>, 571 U.S. 1, 14–15 (2013) (first quotation); <u>Foster v. Love</u>, 522 U.S. 67, 69 (1997) (second quotation))). Indeed, when the Supreme Court has discussed federal power limiting States' authority over elections, it has cited to *congressional* power, not executive power. <u>See</u>, <u>e.g.</u>, <u>Shelby Cnty.</u>, 570 U.S. at 543.

Conversely, there are no similar close calls presented when executive authority is at issue. As a constitutional matter, executive power does not extend to overseeing states' elections.[13] Apart from spheres where federal supremacy

---

[13] The only potential constitutional authority, the Take Care Clause, does not enable the type of election oversight to which the State's Indictment pertains. <u>See</u> U.S. Const. art. II, § 3 ("[The President] shall take Care that the Laws be faithfully executed[.]"). Yet, executive authority under the Take Care Clause "does not extend to government officials over whom [the Executive] has no power or control." <u>Thompson v. Trump</u>, 590 F. Supp. 3d 46, 78 (D.D.C. 2022). The Court accordingly rejects Meadows's suggestion that the Take Care Clause provides a basis for finding executive authority over state election procedures. Doc. No. [45], 9–10.

The Court is also unpersuaded by Meadows's contention that his acts involving state election procedures are within executive power to advise Congress. Doc. No. [45], 10. It would be inconsistent with federalism and the separation of powers, to find that activities which are delegated to the states are also within the scope of executive power because the executive branch may advise Congress. <u>Cf</u>. <u>Fish</u>, 840 F.3d at 725–26 ("The [Elections] Clause is a default provision; it invests the States with responsibility for the mechanics of congressional elections, but *only so far as Congress* declines to preempt state legislative choices." (quoting <u>Foster</u>, 522 U.S. at 69). The Court will not find that the executive branch has some advisory authority in this space in light of the *express* constitutional grant over elections to the States.

supersedes, "States function as political entities in their own right." <u>Bond v. United States</u>, 564 U.S. 211, 221 (2011). Here, there is *clear constitutional authority* delegating the procedures of elections to the States. <u>See</u> Const. art. I, § 4, cl. 1. Thus, the executive branch cannot claim power to involve itself in States' election procedures when the Constitution clearly grants the States the power to manage elections under the Elections Clause.

### b) <u>Statutory requirements</u>

Statutorily, the Hatch Act is helpful in defining the outer limits of the scope the White House Chief of Staff's authority. The State argues, and Meadows agrees, that he is bound by the Hatch Act, a law that prohibits federal employees from engaging in political activity. Doc. No. [27]; Hearing Tr.136:3–5. While the Court does not rely on the merits of a Hatch Act violation, it does recognize that the Hatch Act provides that political activity is not included in the outer limits of the role of the White House Chief of Staff. The Hatch Act prohibits executive branch employees from "us[ing] [their] official authority or influence for the purpose of interfering with or affecting the result of an election[.]" 5 U.S.C. § 7323(a)(1). The federal regulation governing political activities of federal employees prohibits the same. 5 C.F.R. § 734.302(a). The regulation,

moreover, broadly defines "political activity" to be "activity directed toward the success or failure of a political party, candidate for partisan political office, or partisan political group." Id. § 734.101. The types of behaviors that Meadows is alleged to be involved in included post-election activities and election outcomes in various States pertaining to a particular candidate for office. If these potentially political activities indeed come against the Hatch Act, its regulations limit such efforts. These prohibitions on executive branch employees (including the White House Chief of Staff) reinforce the Court's conclusion that Meadows has not shown how his actions relate to the scope of his federal executive branch office. Federal officer removal is thereby inapposite.

### 2.   Meadows's Has Not Met His Burden in Establishing the Acts Are Related to His Federal Office

Even under the "quite low" bar for federal officer removal, the Court concludes that Meadows has not met his burden to show that his criminal prosecution can be removed under the federal officer removal statute. "Although the words 'acting under' are 'broad,' the Supreme Court has emphasized that they are not 'limitless.'" BP PLC, 31 F.4th at 228–29 (quoting Watson v. Philip Morris Cos., Inc., 551 U.S. 142, 150 (2007)); Acker, 527 U.S. at 447 (Scalia, J., dissenting) (opining that the act that forms the basis of "the gravamen of the

suit . . . [is] at least closely connected with, the performance of his official functions.").

The Court concludes that Meadows has not met even the "quite low" threshold for removal. Again, what the Court must decide for purposes of federal officer removal is whether the actions Meadows took as a participant in the alleged enterprise (the charged conduct) were related to his federal role as White House Chief of Staff. The evidence adduced at the hearing establishes that the actions at the heart of the State's charges against Meadows were taken on behalf of the Trump campaign with an ultimate goal of affecting state election activities and procedures. Meadows himself testified that working for the Trump campaign would be outside the scope of a White House Chief of Staff. Hearing Tr. 113:2–6.

As the Court has also explained, the overt acts are merely illustrative in nature and not elements of the crimes charged against Meadows. Nevertheless, the overt acts are set out in the Indictment and Meadows shaped his entire evidentiary presentation around them. Therefore, the Court will assess each of Meadows's overt acts to factually determine if they fall within the scope of Meadows role as a federal officer.

The Court finds Meadows only carried his burden in showing that one of the eight overt acts attributed to Meadows could have occurred within the scope of Meadows's federal office. Overt Act 6 provides that Meadows "sent a text message to United States Representative Scott Perry from Pennsylvania and stated, 'Can you send me the number for the speaker and the leader of PA Legislature[?] POTUS wants to chat with them.'" Doc. No. [1-1], 21. Because Overt Act 6 is phrased so broadly, it is conceivable that it encompasses an activity that is within the scope of Meadows's federal duties. Meadows testified that as part of his role as Chief of Staff, he would retrieve phone numbers of various state officials. Hearing Tr. 47:8–10 ("I was asked on a pretty regular occasion for numbers . . . ."). The omission in the Indictment of the context Meadows sought this phone number, when coupled with the testimony that retrieving phone numbers for state officials was a routine part of his role as Chief of Staff, leaves the Court to conclude Overt Act 6 arguably occurred within the scope of Meadows's duties as White House Chief of Staff.

The Court finds that the evidence presented does not show that most of the remaining overt acts were related to the scope of Meadows's role as Chief of

Staff.[14] The procedures States utilize to conduct elections and ensure results are not part of the executive branch's role or powers. <u>See</u> Section (III)(C)(1)(a) <u>supra</u>. As a senior official in the executive branch, therefore, Meadows cannot have acted in his role as a federal officer with respect to any efforts to influence, interfere with, disrupt, oversee, or change state elections: those activities are expressly delegated to the States.

Overt Act 96 alleges that Meadows sent a text message to the Office of the Georgia Secretary of State's Chief Investigator Frances Watson[15] asking, "[i]s there a way to speed up Fulton County signature verification in order to have results before Jan 6 if the [T]rump campaign assists financially." Doc. No. [1-1], 45. At the hearing, Meadows testified that no federal funds would be available to

_____

[14]  At the hearing, Meadows disputed the merits of Overt Acts 9 and 19. Hearing Tr. 43:10–49:9, 73:18–22, 50:4–9. With respect to Overt Act 9, he disputed that he participated in the November 25, 2020 meeting with the Pennsylvania Legislatures. Hearing Tr. 43:10–49:9, 73:18–22. Similarly, Meadows disputed that he asked McEntee for the memorandum as alleged in the Indictment. Hearing Tr. 50:4–9; Doc. No. [1-1], 24 (Overt Act 19). Meadows is not required to show that he is innocent of the charges against him to successfully remove his case. <u>Soper</u>, 270 U.S. at 32–33. Neither is the State required to prove the overt acts as part of its burden of proof at trial. <u>See</u> Section (III)(A)(2) <u>supra</u>. Accordingly, to the extent necessary, the Court treats the evidence propounded in support of Overt Acts 9 and 19 as neutral to the determination of whether particular Overt Acts were within the scope of Meadows's federal office.

[15] At the hearing, Meadows testified that he believed the message was to Ms. Jordan Fuchs, not Ms. Watson. Hearing Tr. 90:1–6.

the Trump campaign to support this request. Hearing Tr. 93:10–12. Nevertheless, Meadows testified that he was not speaking for the campaign in this message, but that it was "in keeping of me trying to ask a person who should know whether it's a financial resource issue, you know, manpower issue or whatever. So I wasn't speaking on behalf of the campaign." Id. at 93:3–6.

Meadows failed to provide sufficient evidence that these actions related to any legitimate purpose of the executive branch. The Court determines as a matter of fact, making a request to the Georgia Secretary of State's Office regarding a possibility that the Trump campaign could provide financial resources to fund the recount effort, even if not directly on behalf of the campaign, is still campaign-related political activity. Thus, Meadows has not met his burden in establishing that Overt Act 96 related to the scope of his official duties.

Similarly, Overt Act 92 alleges that Meadows traveled to Cobb County, Georgia where he "attempted to observe the signature match audit being performed there by law enforcement officers from the Georgia Bureau of Investigations and the Office of the Georgia Secretary of State." Doc. No. [1-1], 44. Meadows testified that his actions with respect to this allegation were:

> in line with [his duties], because what I did was go to the Cobb County convention center to look at the

> process that they were going through. And in doing so
> was trying to, again, check that box to say, all right,
> everything is being done right here, and so if there's
> allegations of fraud, we need to move on to something
> else.

Hearing Tr. 152:4–17. The Court factually finds that Meadows overseeing State election recount processes related to President Trump's reelection campaign. Meadows failed to provide sufficient evidence that these actions related to any legitimate purpose of the executive branch. Accordingly, the Court finds Meadows has not met his burden in establishing that Overt Act 92 is related to scope of the Office of White House Chief of Staff.

Overt Act 112 alleges that Meadows participated in the January 2, 2021 phone call with Donald Trump and Secretary Raffensperger to unlawfully solicit the Secretary of State to alter the certified returns for the presidential electors for the November 3, 2022 presidential election. Doc. No. [1-1], 51. At the hearing Meadows rationalized his involvement in this call as seeking a compromise and settlement of the Trump campaign's suit against the State of Georgia. He testified "this phone call, setting it up with the attorneys where they could find some kind of compromise. . . ." Hearing Tr. 108:14–17. He acknowledged that the lawyers on the phone call were lawyers for either the President Trump personally or the

38

Trump campaign and that no lawyers from the Office of White House Counsel or the Department of Justice were on the call. Id. at 107:11–108:1; 210:3. The Supreme Court has instructed that involvement in private litigation is not part of the executive branch's role or powers. See Clinton v. Jones, 520 U.S. 681, 702 n.36 (1997). Therefore, based on the evidence presented, the Court finds that the January 2, 2021 phone call was made regarding private litigation brought by President and his campaign against the State of Georgia. It was therefore outside Meadows's federal role as an executive branch officer.

Furthermore, another participant on the call, Raffensperger testified that "[t]hose were Trump campaign lawyers [on the call], so I felt that it was a campaign call." Id. 210:2–3. In the same vein, Meadows's participation in the phone call clearly reflects campaign-related interests. He said:

> Mr. Secretary, obviously there is, there are allegations where we believe that not every vote or fair vote and legal vote was -- was -- counted and that's at odds with the representation from the secretary of state's office. What I'm hopeful for is there some way that we can find some kind of agreement to look at this a little bit more fully. You know the president mentioned Fulton County. But in some of these areas where there seems to be a difference of where the facts seem to lead, and so Mr. Secretary, I was hopeful that, you know, in the spirit of cooperation and compromise is there something that we can at least have a discussion to look at some of these allegations to find a path forward that's less litigious?

SX 3, 12:49–14:00. The record is clear that Meadows substantively discussed investigating alleged fraud in the November 3, 2022 presidential election. Therefore, the Court finds that these contributions to the phone call with Secretary Raffensperger went beyond those activities that are within the official role of White House Chief of Staff, such as scheduling the President's phone calls, observing meetings, and attempting to wrap up meetings in order to keep the President on schedule. Rather, Meadows's participation on the January 2, 2021 call was political in nature and involved the President's private litigation, neither of which are related to the scope of the Office of White House Chief of Staff. By failing to adduce evidence that these actions related to any legitimate purpose of the executive branch, Meadows did not satisfy the burden of showing that these actions related to the color of his office.

Finally, the Court finds that activities by Meadows—even if characterized as scheduling meetings or phone calls or taken for the purpose of advising the President—are "political activities" under the pertinent regulations if they were for the purpose of furthering the common objective of success of a particular presidential candidate. See 5 C.F.R § 734.101. Overt Acts 5 and 93 relate to attending and scheduling meetings and placing phone calls. Doc. No. [1-1], 21–

22, 44. The Court finds that the underlying substance of those meetings and calls were related to political activities and not to the scope of Meadows's federal office.

For the meeting with Michigan state officials, Meadows testified that he recalled "most of that [meeting] had to do with allegations of potential [election] fraud in Michigan . . . .".[16] Hearing Tr. at 44:20–22; see also id. at 64:2–7. He also acknowledged that "President Trump had a personal interest in the outcome of the election in Michigan." Id. at 63:12–15; see also id. at 64:8–13. Accordingly the meeting in Overt Act 5 was outside the scope of his federal executive branch office as they related to State election procedures following the presidential election.

The Court also finds that Overt Act 93 was outside the scope of Meadows's federal executive role. Overt Act 93 alleges that Meadows arranged a phone call between President Trump and the Georgia Secretary of State's Chief Investigator.

---

[16]  Meadows later testified that he did not know of any specific election challenge in Michigan by the Trump campaign or the federal government. Hearing Tr. 57:21–58:4. He further clarified however that "[Trump] was concerned about the election results, but in terms of a lawsuit, [Meadows was] not aware of it." Id. at 63:22–24. The Court finds Meadows's knowledge of President Trump's concern about the election sufficient to find that, at the time of this meeting, Meadows had a general awareness of the post-election activities in Michigan regarding the state's election procedures.

Meadows admits to arranging this phone call. Hearing Tr. 53:17–20. Meadows later testified that he received this phone number either through his attendance of the Cobb County election recount or by his primary contact at the Georgia Secretary of State's Office. Hearing Tr. 89:15–24. Meadows failed to provide sufficient evidence that these actions related to any legitimate purpose of the executive branch. Accordingly, the Court finds that Meadows failed to carry his burden in showing that Overt Act 93 was in the scope of Meadow's official role as Chief of Staff.

As set forth above, the Court finds insufficient evidence to establish that the gravamen, or a heavy majority of overt acts alleged against Meadows relate to his role as White House Chief of Staff. The State has put forth evidence that at various points during the time of the alleged conspiracy Meadows worked with the Trump campaign, which he admitted was outside of the role of the White House Chief of Staff. See SX 3 12:49–14:00. Tr. 91:11–20; 95:19–96:23. In light of the State's evidence that Meadows undertook actions on behalf of the campaign during the time period of the alleged conspiracy, Meadows was required to come forward with competent proof of his factual contention that his actions involving challenges to the outcome of the Georgia's Presidential election results were

within his role as Chief of Staff. His efforts fall short. See Mesa, 489 U.S. at 131–32 ("There must be a causal connection between what the officer has done under asserted official authority and the state prosecution. It must appear that the prosecution of him, for whatever offense, has arisen out of the acts done by him under color of federal authority and in enforcement of federal law, and he must by direct averment exclude the possibility that it was based on acts or conduct of his not justified by his federal duty.").

Instead, the evidence before the Court overwhelmingly suggests that Meadows was not acting in his scope of executive branch duties during most of the Overt Acts alleged. Even if Meadows took on tasks that mirror the duties that he carried out when acting in his official role as White House Chief of Staff (such as attending meetings, scheduling phone calls, and managing the President's time) he has failed to demonstrate how the election-related activities that serve as the basis for the charges in the Indictment are related to any of his official acts. As the substance of the overt acts constituted a significant part of Meadows's testimony and proof of his acting within the scope of his federal office, the Court concludes that based on the factual evidence, Meadows was not acting in the scope of his office for purposes of federal officer removal.

43

### D.    Count 28

Count 28 of the Indictment is substantively the same as Overt Act 112 in the RICO charge. Compare Doc. No. [1-1], 50, with id. at 87. The Court has already determined that the January 2nd phone call was not related to Meadows's role as White House Chief of Staff. See Section III(C)(2) supra. For the same reasons, the Court determines that Meadows's participation on this phone call was not related to the color of the Office of the White House Chief of Staff. Thus, Meadows has not met his burden in establishing that Count 28 related to the color of his office and the Court lacks subject matter jurisdiction over that claim.

### E.    Federal Defenses

The third prong of Section 1442 removal requires the defendant to allege colorable federal defenses. Caver, 845 F.3d at 1145. Meadows asserts that he has immunity from the charges, under the Supremacy Clause, because he was acting pursuant to the scope of his office. In his Motion to Dismiss, he also asserts a First Amendment political speech defense and a Due Process defense. Doc. No. [15-1], 29–31. Because Meadows has failed to carry his burden with respect to the

charged conduct's relationship to the scope of his federal office, the Court declines to address Meadows's defenses.[17]

### F.    Federalism

Finally, the Court finds support for its conclusion that Meadows was not acting in the scope of his federal officer role for the purpose of Section 1442. Federal officer removal's "'basic' purpose is to protect the Federal Government from the interference with its 'operations[.]'" Watson, 551 U.S. at 150 (2007). It "is an incident of federal supremacy and is designed to provide federal officials with a federal forum in which to raise defenses arising from their official duties." Caver, 845 F.3d at 1142 (quoting Cohen, 887 F.2d at 1453). At least in the civil context, "[t]he removal statute itself merely serves to overcome the 'well-pleaded complaint' rule which would otherwise preclude removal even if a federal defense were alleged." Mesa, 489 U.S. at 136.

---

[17] The Superior Court may have to decide these issues at a later time, and evaluating them here should be avoided unless absolutely necessary. The "principle of federalism" shows "that federal courts must not interfere in state judicial processes because state courts of general jurisdiction are authorized and competent, as front-line fora, to adjudicate all relevant questions of both state and federal law." Penthouse Intern., Ltd. v. Webb, 594 F. Supp. 1186, 1192 (N.D. Ga. 1984) (citing Younger v. Harris, 401 U.S. 37, 43–44 (1971)).

Here, Section 1442's purposes would not be fulfilled by removal. Meadows raises a federal officer immunity defense that the Indictment's charged acts were made under his federal authority and directed at state actions. The Indictment's associations and acts, as well as Meadows's presented evidence, however, all indicate that federal officials (or those purporting to act on behalf of federal officials) engaged in post-election activities that clearly fall outside executive authority and expressly within the constitutional gamut of the States.

Assuming jurisdiction over this criminal prosecution would frustrate the purpose of federal officer removal when the state charges allege—not *state interference* with constitutionally protected federal activities, but—*federal interference* with constitutionally protected state actions. This result cannot stand in the face of federalism, "a concept which retains vitality and importance in our modern constitutional scheme," and the Constitution's express delegation of election activities to States. United States v. Ballinger, 395 F.3d 1218, 1248 (11th Cir. 2005) (Birch, J., dissenting). Thus, the purposes of federal officer removal are served, rather than thwarted, by the Court's conclusion that it has no jurisdiction over the removal of Meadows's criminal prosecution.

\* \* \* \*

As the foregoing analysis illustrates, the Court concludes that Meadows has not shown that the actions that triggered the State's prosecution related to his federal office. The Constitution, federal statute and regulation of executive branch employees, and the purpose of Section 1442 support this conclusion. Meadows's alleged association with post-election activities was not related to his role as White House Chief of Staff or his executive branch authority.

The Court acknowledges that federal officer's "relating to" requirement is "broad." Caver, 845 F.3d at 1144. The Court also acknowledges that "[f]ederal courts credit the removing party's theory of the case for purposes of determining if a federal officer both acted 'under color of office' and raised 'a colorable federal defense.'" Heinze, 637 F. Supp. 3d at 1322 (quoting Acker, 527 U.S. at 432). The Court does not take lightly these standards in rendering its conclusion that federal officer removal is not supported here. Rather, the Court concludes that if it were to agree with Meadows's arguments regarding removal, the Court would have to turn a blind eye to express constitutional power granted to the States to determine their election procedures, as well as federal statutory and regulatory limitations on political activities of executive branch officials. The Court would

be ignoring the evidence Meadows himself submitted of his post-election related activities and the purpose of the federal officer removal statute. It would be legally and factually erroneous for the Court to do so.

The Court makes clear this Order determines only that, as a federal court with limited jurisdiction, it lacks any basis for jurisdiction over Meadows's criminal prosecution. The Court's conclusion is not to suggest any opinion about the State's case against Meadows. The Court makes no ruling on the merits of the charges against Meadows or any defense that he may offer. Meadows maintains the presumption of innocence and bears no burden of proving that he did not commit the crimes charged against him. The burden of proof beyond a reasonable doubt remains with the State. This Order's sole determination is that there is no federal jurisdiction over the criminal case. The outcome of this case will be for a Fulton County judge and trier of fact to ultimately decide.

The Court also makes clear that its determination on Meadows's notice of removal and its jurisdiction over his criminal prosecution does not, at this time, have any effect on the outcome of the other co-Defendants who have filed notices

of removal of the criminal prosecution against them.[18] The Court will assess these Defendants' arguments and evidence following the forthcoming hearings on the notices of removal, independent of its conclusion in this Order.

## IV.   CONCLUSION

For the foregoing reasons, the Court **DECLINES** to assume jurisdiction over the State's criminal prosecution of Meadows under Section 1455 and **REMANDS** the case to Fulton County Superior Court. The Court also **DIRECTS** the Clerk of Court to **TERMINATE** all pending motions and **CLOSE** this case.

**IT IS SO ORDERED** this 8th day of September, 2023.

**HONORABLE STEVE C. JONES**
**UNITED STATES DISTRICT JUDGE**

---

[18] See Georgia v. Jeffrey Bossert Clark, No. 1:23-cv-03721-SCJ (NDGa.); Georgia v. David James Shafer, No. 1:23-cv-03720-SCJ (NDGa.); Georgia v. Shawn Micah Tresher Still, No. 1:23-cv-03792-SCJ (NDGa.); Georgia v. Cathleen Alston Latham, No. 1:23-cv-03803-SCJ (NDGa.).